J-A10001-15

2015 PA Super 141

| K.T. AND M.R.T. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| L.S. F/K/A L.R. | |
| Appellee | No. 2072 MDA 2014 |

Appeal from the Order Entered November 6, 2014
In the Court of Common Pleas of York County
Civil Division at No(s): 2013-FC-001604-03

BEFORE:  GANTMAN, P.J., MUNDY, J., and JENKINS, J.

OPINION BY GANTMAN, P.J.:                    **FILED JUNE 17, 2015**

Appellants, K.T. ("Paternal Grandmother") and M.R.T. ("Paternal Grandfather") (collectively, "Paternal Grandparents"), appeal from the order entered in the York County Court of Common Pleas, which denied their request for partial physical custody of their minor grandchildren, K.A.T. (born in September 2007) and K.W.R. (born in March 2009) ("Children"), in this custody action.  We reverse and remand for further proceedings.

The certified record indicates the relevant facts and procedural history of this case as follows.  Appellee, L.S. f/k/a L.R. ("Mother"), and D.T. ("Father") are the natural parents of Children.  Mother gave birth to K.A.T. while she was in high school and living with her mother ("Maternal Grandmother").  Maternal Grandmother would not permit Father to live with Mother because they were unmarried, so Mother moved in with Father in

Paternal Grandmother's home in December 2007, when K.A.T. was approximately two months old.[1]  Mother and Father did not marry, but they maintained a relationship until early 2009.  In January 2009, when Mother was pregnant with their second child, K.W.R., Mother and Father separated and Mother moved with K.A.T. out of Paternal Grandmother and W.B.'s home.[2]  At that time, Mother moved in with a co-worker for several months.

Beginning in January or February 2009, Mother and Father split custody of K.A.T.  During Father's periods of physical custody, Children resided with Father in Paternal Grandmother and W.B.'s home.  Mother gave birth to K.W.R. in March 2009.  Mother and Father subsequently split custody of K.W.R. as well.  In April 2009, Mother met D.S.  In May 2010, Mother married D.S. ("Mother's Husband") in Hawaii; Father and Mother agreed Father would take custody of Children while Mother was in Hawaii to marry.  In the summer of 2010, Father anticipated imminent deployment to Iraq.  Based on his expected deployment, Father agreed Mother could take

---

[1] Paternal Grandparents were divorced in 1998.  When Mother and K.A.T. moved in with Paternal Grandmother, Paternal Grandmother was living in Erie County with her long-term significant other, W.B., with whom she still resides.  Paternal Grandfather also lives in Erie County with his significant other, D.D.

[2] The parties dispute whether Mother moved out of Paternal Grandmother and W.B.'s home in December 2008 or January 2009.  When Mother moved out, Father was away in basic training for the United States Army since September 2008.

Children to live in Hawaii with Mother's Husband.[3] Mother and Father agreed Father would have custody of Children during the summer months and holidays, and that Father could communicate with Children via phone calls and social media. Around August 2010, Mother and Mother's Husband moved with Children to Hawaii. Mother obtained a new telephone number, but she did not disclose her new phone number to any of Father's family members, including Paternal Grandparents, and limited Children's telephone communication only to Father. After Mother had already moved to Hawaii with Children, Father learned his anticipated deployment would not occur, but he continued to permit Mother to live with Children in Hawaii. Mother and Father agreed that if Mother moved back to Erie County, they would again split physical custody of Children on an equal basis.

In November 2011, Mother and Mother's Husband returned from Hawaii with Children and moved to Clymer, New York.[4] The parties dispute whether Mother told Father she had moved back from Hawaii with Children. In August 2012, Mother and Children moved with Mother's Husband to Wisconsin. Mother obtained a new phone number upon moving, which she did not give to Father or Paternal Grandparents. On February 17, 2013, while Mother and Children were still living in Wisconsin with Mother's

_____

[3] Mother's Husband was in the Army and stationed in Hawaii at that time.

[4] Clymer, New York is approximately eight miles away from Corry, Pennsylvania (where Paternal Grandmother and W.B. live in Erie County).

Husband, Father died in an automobile accident. Mother and Children did not attend Father's funeral. Around March 2013, Mother and Mother's Husband moved with Children to York County, Pennsylvania, where they currently reside.

On September 6, 2013, Paternal Grandparents filed a joint petition in York County seeking partial physical custody of Children.[5] At the time Paternal Grandparents filed their petition, Mother had denied them any access whatsoever to Children. By order dated October 4, 2013 and entered October 7, 2013, the court issued an interim custody order granting sole legal and primary physical custody of Children to Mother. The court awarded Paternal Grandparents the following periods of partial physical custody, beginning with a "phase-in" schedule:[6] (1) Friday, September 27, 2013, from 5:30-7:30 p.m., in York County, with Mother present; (2) Saturday, September 28, 2013, from 9:30 a.m. until 12:00 p.m., in York County, with Mother present; (3) December 27-29, 2013, at Paternal Grandmother's home in Erie County, phasing out Mother's presence during the scheduled visits; and (4) two weekends between January 1, 2014 and June 1, 2014, in

_____

[5] Paternal Grandparents previously filed a joint petition for partial custody in Erie County but withdrew that petition to refile in York County. Paternal Grandparents have standing to seek partial custody pursuant to 23 Pa.C.S.A. § 5325(1) (stating where parent of child is deceased, parent or grandparent of deceased parent may file action of partial physical custody or supervised physical custody).

[6] The parties live approximately 5½ hours away.

York County. The interim custody order provided the following regular schedule of partial physical custody thereafter: (1) three weeks over the summer (one week in June, July, and August) in the summer of 2014 and each following summer; (2) two weekends each in the fall and spring to occur in York County; (3) four overnight periods during Children's Christmas break, between December 27th through December 31st each year; and (4) any other times agreed to by the parties. The interim custody order also included a provision for Skype communication between Children and Paternal Grandparents to occur each Sunday at 7:00 p.m., beginning on October 6, 2013.

After Paternal Grandparents commenced their custody action, Mother's Husband started proceedings to adopt Children. The court initially granted the adoption, but Paternal Grandparents intervened on or around November 4, 2013, when they learned of the proceedings. Because Mother and Mother's Husband failed to notify Paternal Grandparents about the adoption proceedings, the court vacated the adoption decree.[7]

The court held a custody trial on February 10, 2014. At the start of trial, the court announced it was the first custody trial the court had presided over in approximately five years. The court expressed dissatisfaction with

---

[7] At the time of trial, Mother's Husband testified he planned to re-commence the adoption proceedings once the custody proceedings were resolved.

the legislature's enactment of the Custody Act since the court had last presided over a custody trial. The court stated:

> Frankly, I'm not sure how I want to do this. But since this is the first custody trial that I have to sit on—fortunately, the other cases assigned to me have been resolved by agreements.
>
> That being so, I think it fair to counsel to advise them that I did sit and try and figure out when the last custody trial I had and I think it was about five years ago having other assignments in the interim.
>
> And during that period of time, the legislature enacted a big comprehensive custody act, bunch of stuff that they did. They determined that they needed to help the courts in deciding these cases by telling them what factors they have to consider in determining what the best interest of the child or children is.
>
> Honestly, I've taken a look at the statute. I have personal reservations as to whether the legislature can tell me how to make a decision. But I'm told that's the way we do it.
>
> So counsel should be on the alert that I haven't studied these things. I haven't gone and looked and figured out whatever. So touch base on those things that you think are important to decide what is in the best interest[s] of these children.

(N.T. Trial, 2/10/14, at 11-12; R.R. at 9a).

Paternal Grandmother testified, *inter alia*, as follows.[8] Mother moved into her home when K.A.T. was approximately two months old. Paternal Grandmother and Mother had a nice relationship while Mother lived with her and W.B. During this time, Mother wrote Paternal Grandmother and W.B. a

---

[8] (**See id.** at 14-74; R.R. at 10a-40a.)

"thank you" card expressing gratitude for their kindness and generosity, as well as a Valentine's Day card.[9] Mother also wrote Paternal Grandmother a "get well" card after Paternal Grandmother had surgery. On February 7, 2008, Mother executed an "authorization for treatment of a minor" form, which gave Paternal Grandmother and W.B. authority to accompany K.A.T. to doctor's appointments and to consent to K.A.T.'s medical examinations and/or treatment.

Mother moved out in January 2009. When Mother and Father split custody of Children, Father was living with Paternal Grandmother, so

_____

[9] The "thank you" card states:

> I wanted to find a thank you card filled with all the words that I feel. But then I found this card & knew it was perfect [because] it's in this card that I can write down my own feelings with all of my own words.
>
> [Paternal Grandmother and W.B.,]
>
> Everything you guys do and have done for me (& [K.A.T.]) is so appreciated. I hope that eventually I can help you the way that you've helped me. You've dealt with my bullshit and helped me on my feet—and for that I'm truly grateful. I've never met two other people who are so willing to help others. You've given me so much & much of that isn't what money can buy. You've taught me lessons that I won't forget & shown me love that I will always remember. I thank you both for all that you do. Thank you for everything.
>
> [Mother].

(Paternal Grandparents' Exhibit 3).

Children stayed at Paternal Grandmother and W.B.'s home during Father's periods of physical custody. Paternal Grandmother testified Mother refused to let Paternal Grandparents communicate with Children when they lived in Hawaii. Paternal Grandmother explained Mother threatened Father while in Hawaii that if Father disclosed Mother's phone number to Paternal Grandparents, or allowed anyone else on the phone line during Father's phone calls with Children, that Mother would disconnect the call. Mother also "un-friended" Paternal Grandmother on Facebook.

Paternal Grandmother testified that Mother failed to tell Father when she moved from Hawaii to Clymer, New York. In February 2012, Father learned that Mother was in Clymer, and when Father confronted Mother about moving from Hawaii, Mother claimed she was back in town for a short time on vacation. Paternal Grandmother explained Mother agreed Father could visit Children once during this "vacation" period. Paternal Grandmother testified that Father visited Children again in July 2012, when Father discovered through Maternal Grandmother that Mother was still living with Children in Clymer. In August 2012, Father returned to Clymer to visit Children again, but Mother had already moved away.

Following Father's sudden death in February 2013, Paternal Grandmother hired a private investigator to locate Mother and Children. When the private investigator discovered Mother had an address in Wisconsin, Paternal Grandmother hired a second private investigator in

Wisconsin. Ultimately, Paternal Grandmother located Mother and Children in York County, Pennsylvania. Upon finding Mother and Children, Paternal Grandparents served Mother with the custody complaint.

Paternal Grandmother testified that Mother was uncooperative with the terms of the interim custody order. With respect to the court-ordered Skype conversations, Paternal Grandmother said Mother claimed her camera was broken, so Paternal Grandparents could not actually see Children during the calls. Paternal Grandmother's son, S.T. ("Children's Uncle"), offered to fix Mother's camera free-of-charge, but Mother refused the offer. Paternal Grandmother testified that if she called Mother to speak with Children outside of the court-ordered Skype timeframe, Mother would not answer the phone or she would state it was not a good time or tell Paternal Grandmother to wait until the court-ordered timeframe to speak with Children.

Paternal Grandmother testified that Paternal Grandparents' first visit with Children under the interim custody order was a success. The visit took place at an arcade, and Children recognized Paternal Grandparents right away. Paternal Grandmother also spoke highly of Paternal Grandparents' visit with Children over the Christmas holiday. Paternal Grandmother had a Christmas party at her home with Children's extended family. Paternal Grandparents, their significant others, and Children's paternal aunts, uncles, cousins, and other relatives attended. Children made glow bugs, balloons,

made a Christmas gift for Mother, and played with their cousins. Children also participated in a balloon launch to honor Father's memory. Children's great-aunt gave Children a memory box containing a small toy soldier and Father's dog tags. Mother later discarded the toy soldier, claiming it promoted violence.

While the interim custody order was in place, Paternal Grandmother sent Children Captain America and Superman action figures. Paternal Grandmother testified Mother also discarded these action figures as "too violent," even though Mother permitted Children to dress-up as Superman and Batman for Halloween.

Paternal Grandmother admits she has rheumatoid arthritis. Paternal Grandmother denied having any health issues which would impede her ability to care for Children. Paternal Grandmother and W.B. both smoke cigarettes but do not smoke around Children. Paternal Grandmother admitted she was charged with passing a bad check in 2012 and with theft of services in 2009.[10] Paternal Grandmother did not explain the details of these charges.

Paternal Grandmother is currently employed with Interim Health Care for the past four years. Prior to her employment with Interim Health Care,

---

[10] Counsel for Paternal Grandparents objected to the admission of testimony concerning these criminal charges. The court overruled the objection as relevant to Children's best interests. Paternal Grandparents challenge this evidentiary ruling in their third issue on appeal.

Paternal Grandmother owned a daycare which she operated out of her home. Children were enrolled in the daycare when Father was at work during his periods of physical custody (when Father and Mother had split custody). Father paid Paternal Grandmother approximately $14.00 or $15.00 each week as his "co-pay" for the daycare services. Paternal Grandmother said Father paid her to babysit K.A.T. even when Mother had been living with Paternal Grandmother and W.B.

Paternal Grandmother intervened with the adoption proceedings because she does not want Mother's Husband to adopt Children. Paternal Grandmother said Mother's Husband uses military-style discipline with Children. Paternal Grandmother also expressed concerns that Mother's Husband is racist, based on his Facebook posts related to "racial stuff and Nazi stuff."[11]

Paternal Grandmother requested the court to enlarge Paternal Grandparents' periods of partial physical custody under the interim custody order. Paternal Grandmother sought three weekends each in the fall and spring to occur in Erie County so that Children's extended family can see Children. Paternal Grandmother suggested the parties could meet at a half-way point to exchange custody. Paternal Grandmother also sought two weeks' custody in June, July, and August. Paternal Grandmother explained

---

[11] The Facebook rants were keenly distressing to Paternal Grandmother because W.B. is African-American.

that she has an amicable relationship with Paternal Grandfather, and they agreed that during Paternal Grandparents' periods of partial physical custody, Children will stay overnight at Paternal Grandmother and W.B.'s home; Paternal Grandfather will see Children during the daytime.

Paternal Grandfather testified, *inter alia*, as follows.[12] Paternal Grandfather has a good relationship with Paternal Grandmother. Paternal Grandfather goes to Paternal Grandmother's house during the court-ordered timeframe for Skype calls with Children. Paternal Grandfather echoed Paternal Grandmother's testimony regarding the successful first visit with Children under the interim custody order. Paternal Grandfather said Children remembered him when Paternal Grandfather first saw them at the arcade. Paternal Grandfather had a great interaction with Children at the Christmas visit as well. Children asked Paternal Grandfather to teach them guitar. Paternal Grandfather admitted he had a problem with alcohol abuse in the past that worsened after Father's death. Paternal Grandfather currently attends Alcoholics Anonymous meetings twice each week and does not consume alcohol. Paternal Grandfather last consumed alcohol on December 21, 2013. When confronted with a recent picture of himself holding a beverage can, Paternal Grandfather described the beverage

---

[12] (*See* N.T., 2/10/14, at 75-93; R.R. at 41a-50a.)

pictured as a "Genny NA"; the "NA" stands for non-alcoholic.[13]   Paternal Grandfather smokes cigarettes, but he does not do so in front of or around Children.

Paternal Grandfather is unemployed due to a 1996 work-related oil field injury that required multiple surgeries.  Paternal Grandfather currently collects social security disability and has no residual effects from the injury which would impair his ability to care for Children.  Paternal Grandfather discussed a custody schedule with Paternal Grandmother and echoed Paternal Grandmother's request for additional time with Children.  Paternal Grandfather confirmed Paternal Grandmother's statement that Children would sleep at Paternal Grandmother and W.B.'s home during Paternal Grandparents' periods of partial physical custody.  Paternal Grandfather indicated that he will travel with Paternal Grandmother to York County to visit Children if the court permits Paternal Grandparents to exercise partial physical custody; they will obtain separate rooms in the same hotel.

Paternal Grandfather indicated he did not call Mother to speak with Children while they were in Hawaii because Mother threatened to disconnect her phone and disappear with Children if anyone from Father's family contacted her.  Paternal Grandfather said Father did not disclose Mother's phone number to his family members in fear of losing Children.  Paternal

---

[13] The Genesee Brewing Company website confirms that "Genny NA" is a non-alcoholic beer.  *See* http://www.geneseebeer.com/beer/genesee-na/.

Grandfather asked Maternal Grandmother for Mother's address, but Maternal Grandmother would not disclose it. Maternal Grandmother gave Paternal Grandfather a ride home once. Maternal Grandmother asked where Father was and told Paternal Grandfather that she knew where Children were residing. Father happened to be at Paternal Grandfather's home at that moment. Father then had a discussion with Maternal Grandmother outside of Paternal Grandfather's presence, after which Father left Paternal Grandfather's home with Maternal Grandmother to see Children.[14]

Laurie Rogan, the first private investigator Paternal Grandmother hired, testified via telephone, *inter alia*, as follows.[15] Paternal Grandmother hired her in March 2013 to locate Mother and Children. Ms. Rogan's initial investigation led her to believe Mother and Children were residing in Wisconsin. Paternal Grandmother subsequently hired a private investigator in Wisconsin, who determined that Mother and Children had lived there but moved. Ms. Rogan subsequently sent a United States Postal Service ancillary service request to obtain Mother's forwarding address, which provided Mother's current location in York County, Pennsylvania.

---

[14] Paternal Grandfather did not elaborate on the details of this event, but additional testimony at trial indicated that Father's interaction with Maternal Grandmother took place while Mother was living with Children in Clymer, New York, shortly before she moved to Wisconsin in August 2012.

[15] (**See** N.T., 2/10/14, at 94-105; R.R. at 51a-56a.)

Children's Uncle testified, *inter alia*, as follows.[16] Children's Uncle offered to fix Mother's computer for no charge so the Skype visual technology would work. During Children's visit over the Christmas holiday, Children recognized Children's Uncle and jumped into his arms. Children's Uncle played guitar with Children, and they built toys. Children's Uncle observed that Children seemed very happy during their visit with Father's family over Christmas. Children's Uncle did not contact Mother when she lived in Hawaii with Children because Father told him that if anyone from his family were to call Mother, she would hang up the phone. Children's Uncle has attempted to contact Mother on Facebook in the past, but he cannot find her name; so Children's Uncle believes Mother "blocked" him.

W.B. testified, *inter alia*, as follows.[17] W.B. is Paternal Grandmother's significant other. W.B. has known Children since they were babies; Children call W.B. "poppy." W.B. loves Children as if they are his biological grandchildren; W.B. gets along very well with Children. Mother lived with K.A.T. in Paternal Grandmother and W.B.'s home. W.B. and Mother were mostly friendly during that timeframe.

In June 2010, the Commonwealth charged W.B. with harassment due

_____

[16] (**See id.** at 105-116; R.R. at 56a-61a.)

[17] (**Id.** at 116-135; R.R. at 61a-71a.)

to a physical altercation with a neighbor;[18] the neighbor had pulled into W.B.'s driveway, continually revved his engine, and refused to exit W.B.'s property. The Commonwealth also charged the neighbor in relation to the incident. The neighbor no longer lives in W.B.'s neighborhood. W.B. did not recall a charge against him for trespass by a motor vehicle.

W.B. is currently disabled due to multiple degenerative discs. W.B. receives social security disability. W.B. does not drink alcohol.

W.B. attended the first visit between Paternal Grandparents and Children under the interim custody order. Children remembered W.B. and called him "poppy." The second visit with Children under the interim custody order took place on September 28, 2013, at a park. W.B. also attended that visit and played tag with Children, at great physical cost. At the Christmas visit at Paternal Grandmother and W.B.'s home, Children were excited and appeared to have lots of fun. Children made Mother pictures of reindeer as a Christmas gift.

W.B. denied he smoked marijuana in his home when Mother lived there. W.B. also denied driving by Mother's place of employment after Mother had moved out of his home. Following W.B.'s testimony, Paternal Grandparents rested their case.

_____

[18] Counsel for Paternal Grandparents objected to testimony concerning this harassment charge, but the court overruled the objection as relevant to Children's best interests.

Mother testified, *inter alia*, as follows.[19] Mother moved out of Maternal Grandmother's home in December 2007 and moved into Paternal Grandmother and W.B.'s home at that time. Mother lived with Paternal Grandmother and W.B. with K.A.T. until December 2008. Mother's relationship with Paternal Grandmother was good at first. Over the course of Mother's stay at Paternal Grandmother and W.B.'s home, Mother's relationship with Paternal Grandmother worsened. Mother felt like nothing she did was good enough while living in Paternal Grandmother's home. Mother said Paternal Grandmother had strict rules. For example, Paternal Grandmother would not allow Mother to talk on the phone or go to the grocery store without Paternal Grandmother's permission. Mother claimed Paternal Grandmother told Mother that if she wanted to move out, Mother would have to leave K.A.T. with Paternal Grandmother and W.B.

Mother conceded that she let Paternal Grandmother watch K.A.T. while Mother worked; Mother enrolled K.A.T. in Paternal Grandmother's home daycare. Mother said she paid Paternal Grandmother for her daycare services using government assistance. Mother paid Paternal Grandmother every other week; Father paid Paternal Grandmother on the alternating

---

[19] (***Id.*** at 136-209; R.R. at 71a-108a.)

weeks.[20]    Mother claimed Paternal Grandmother forced her to commit welfare fraud; Mother alleged she ultimately had to repay the government as a result.[21]

Mother claimed she also had difficulties with W.B. while living in his home.  Mother said she initially liked W.B. but is now "terrified" of him.  Mother observed W.B. smoke marijuana in the home.  Mother claimed she once overheard W.B. talking about a drug deal, and W.B. threatened to kill Mother if she told anyone what she had heard.  Mother said she could not escape from Paternal Grandmother and W.B.'s home because they allegedly had video surveillance around the home and trained guard dogs.

When confronted with the letters Mother wrote to Paternal Grandmother and W.B. while living in their home, Mother claimed she was grateful to have a roof over her head.  Mother testified: "I know how to count my blessings regardless of how bad something can be, and I did not want to make [Paternal Grandmother and W.B.] mad."  (N.T., 2/10/14, at 182; R.R. at 94a).

Mother said she had an okay relationship with Paternal Grandfather.  According to Mother, Paternal Grandfather drank a lot.

---

[20] Mother claimed she had receipts for each payment she made to Paternal Grandmother, but she did not present those receipts at trial.

[21] Mother presented no evidence at trial to substantiate these allegations.

Mother testified that she attempted to contact Father at basic training to inform him she planned to move out of Paternal Grandmother and W.B.'s home with K.A.T. Mother's attempts to reach Father at basic training were unsuccessful. Mother left in the middle of the night in December 2008 and moved in with a co-worker with K.A.T.; Mother was pregnant with K.W.R. at that time. Father returned home from basic training for a break around January 2009. Mother met with Father at that time and brought K.A.T. to their meeting. Mother claimed Father "kidnapped" K.A.T. for a week and refused to return K.A.T. to Mother's care until Mother's relative threatened Father that he would lose his military career if he did not return K.A.T. Mother admitted she did not report the alleged kidnapping to any authorities.

In early 2009, Mother and Father split physical custody of K.A.T. on a 50/50 basis. Mother gave birth to K.W.R. in March 2009. Once K.W.R. reached six months' old, Mother and Father split physical custody of K.W.R. on a 50/50 basis as well. Mother said Father did not utilize all of his custodial time with Children under the shared custody arrangement. Mother conceded that Paternal Grandparents might have spent time with Children during Father's periods of physical custody, though she was uncertain where Father lived at this time.

Mother began a relationship with D.S. in April 2009, and they married in May 2010. Mother admitted that Father took custody of Children for two

weeks while she was in Hawaii to marry.[22]  Mother and Father agreed that Mother could take Children to live in Hawaii with Mother and Mother's Husband if Mother agreed to release Father from his child support obligation. The agreement provided that Father would get custody of Children during the summertime, holidays, and have unlimited communication with Children through phone calls and social media.  Mother also agreed the custody arrangement would revert to 50/50 custody if Mother moved back to Erie County.

Mother moved with Children and Mother's Husband to Hawaii in September 2010.  Mother said Father called only once every four to six months while she lived in Hawaii with Children.  Father did not send Children cards while they lived in Hawaii.  Mother admitted she told Father not to disclose her phone number to others, but she did not recall threatening to run away with Children if Father gave out her number.  Mother said Father did not utilize all of his custody time with Children in the summer because Father anticipated deployment overseas.

Mother, Children, and Mother's Husband relocated from Hawaii to Clymer, New York in November 2011.  Mother stayed in New York until August 2012, when she moved with Children and Mother's Husband to

_____

[22] Counsel for Paternal Grandparents suggested that Father took custody of Children for six weeks while Mother was in Hawaii to marry; Mother denied this proposition.

Wisconsin.[23]  Mother claimed she told Father about her return to New York, and she permitted Father to see Children.  Mother said her stay in New York was only temporary, to use up Mother's Husband's vacation time from the Army.  Mother admitted she told Husband she was only in New York on vacation.  Mother conceded she did not immediately tell Father she was back from Hawaii for good.  Mother denied that she was hiding from Father or Father's family while she moved around the country.

Mother, Children, and Mother's Husband moved to Wisconsin in August 2012, when Mother's Husband started school.  After the move to Wisconsin, Mother claimed she had problems with her phone which necessitated a new phone number.  Mother did not tell Father her new phone number.  Mother

---

[23] Mother admitted she was angry with Maternal Grandmother for bringing Father to see Children in New York the night before Mother and Children moved to Wisconsin.  Counsel for Paternal Grandparents had the following exchange with Mother regarding this incident:

> [Counsel]:    [I]f I ask [Maternal Grandmother] whether she brought [Father] to Clymer, New York, because she thought it was wrong for you to be hiding these kids from him, she's going to tell me that I'm full of crap and that didn't happen?
>
> [Mother]:    Good luck.  My mom is a pistol.  Good luck.
>
> [Counsel]:    You were angry with your mother, weren't you, because of what she did?
>
> [Mother]:    Yeah.

(N.T., 2/10/14, at 192; R.R. at 99a).

claimed Father still could have contacted Mother through Facebook, if he wanted to reach her. When Father died in the automobile accident in February 2013, Mother was living with Children and Mother's Husband in Wisconsin. Mother did not attend the funeral because of the cost of travel. Additionally, Mother claimed Children did not really know Father and regarded Father as the "guy with the cool tattoo." After Father's death, some of his family reached out to Mother's Husband through Facebook, asking to see Children. Mother denied their request, stating Father's family had not previously made any effort to see Children. Paternal Grandmother tried to contact Mother to discuss Father's life insurance policy, but Mother did not want to work with Paternal Grandmother.

Mother testified that Children's behavior has changed since entry of the interim custody order. Mother claimed Children now need counseling because they are wetting the bed and having nightmares. Mother insisted Children's emotional issues did not begin until after entry of the interim custody order. Mother said Children hate the Skype calls, and the calls are terrible. Mother contended Children have nightmares because of the Skype calls. Mother tried to fix her phone to allow use of the visual technology, but her efforts were unsuccessful. Mother testified that Children's first visit with Paternal Grandparents under the interim custody order was terrible. Children did not recognize Paternal Grandparents and Children hid behind

Mother's leg when they saw Paternal Grandparents. Mother claimed she had bruises on her leg from Children squeezing her so tight.

Mother would not permit Children to play with the action figure toys Paternal Grandparents sent Children because Mother said that the toys promote violence. Mother threw away candy Paternal Grandparents sent Children because Mother thinks candy is bad for Children. Mother complained Children returned home, from the Christmas visit with Paternal Grandparents, smelling like cigarettes and were sick and exhausted after this visit.

Mother denied Paternal Grandmother's request to speak with Children on the phone outside of the court-ordered Skype timeframe because Mother said Children are too busy. Children participate in martial arts classes two to four days each week. Mother does not want Paternal Grandparents to have any custody of Children whatsoever because she thinks Paternal Grandparents are horrible people. Mother admitted that she once filed an abuse report against Paternal Grandmother, which Children and Youth Services ruled "unfounded."

Mother's Husband testified, *inter alia*, as follows.[24] Mother's Husband has a good relationship with Children. Prior to Father's death, Mother's Husband was on good terms with Father. Mother's Husband gave his phone

---

[24] (*Id.* at 210-229; R.R. at 108a-118a.)

number to Father in case Father was unable to reach Mother. Mother's Husband said Father did not exercise his holiday time with Children while they lived in Hawaii. Father called Children only five or six times while they were in Hawaii.

Mother's Husband said that during Children's first visit with Paternal Grandparents under the interim custody order, Children seemed uncomfortable. Mother's Husband denied that Children ran into Paternal Grandparents' arms at the first visit. Children called Paternal Grandmother "nana" only after she repeated that word to Children multiple times. Children are not excited to participate in the Skype calls. Mother's Husband has tried to fix the visual technology for the Skype calls but to no avail.

Mother's Husband initially denied posting racist and Nazi-type comments on Facebook. Mother's Husband said he is not a racist or a Nazi. Upon further questioning, Mother's Husband admitted he posted a response to a friend's comment on Facebook on August 11, 2011, stating: "We need to start a fucking chapter of the KKK or Nazi or something. I refuse to live in a town with anything but whites." (*Id.* at 227; R.R. at 117a.) Mother's Husband said this post "was a joke because [my friend was talking] about all of the niggers moving here because there is lots of them." (*Id.* at 227-28; R.R. at 117a.) Mother's Husband said he was not serious. Mother's Husband admitted he had a conversation with a friend on Facebook on February 15, 2013, in which Mother's Husband said: "I want to go nigger

hunting." (*Id.* at 224; R.R. at 115a.) Mother's Husband defended this comment as follows: "…I was angry. But nigger by definition is an ignorant person. It does not mean anybody of color." (*Id.* at 228; R.R. at 117a.)

Mother's Husband said he has African-American friends. Mother's Husband could not recall posting a picture of Hitler to his Facebook page, stating: "Hail to Hitler. We should all be like him." (*Id.*) Mother's Husband explained that when he was in the Army he would shave his head and people would call him Hitler because his last name is German, so if Mother's Husband did post a picture of Hitler, it was meant as a joke. Mother's Husband conceded that on October 18, 2013, he posted: "…I won't stop until they get nothing because that's what they deserve[,]" in reference to Paternal Grandparents and the current custody action. (*Id.* at 226; R.R. at 116a.) Mother's Husband's Facebook post referencing Paternal Grandparents continued that during Paternal Grandparents' last visit with Children, Mother's Husband believed Paternal Grandparents were high on pain pills.

Mother's Husband said he disciplines Children using exercise. Mother's Husband makes Children do squats, leg lifts, and other forms of exercise as punishment. Children learn a similar discipline in their Hapkido marital arts classes. Mother's Husband said Mother did not throw away the action figure toys Paternal Grandparents sent Children; Mother stored the action figures in the laundry room because Mother and Mother's Husband do not allow

Children to play with toys that promote violence. Mother's Husband said Children's behavior has changed since the start of the custody proceedings. Children sleep in Mother and Mother's Husband bed more frequently and have nightmares. Children are currently in counseling.

Mother's Husband tried to adopt Children. Paternal Grandparents intervened, which caused the court to vacate the adoption decree. Mother's Husband still plans to adopt Children after these custody proceedings are resolved.

Mr. Dennis Lagan is a private investigator whom Mother hired for purposes of the custody proceedings. Mr. Lagan testified, *inter alia*, as follows.[25] Mother hired Mr. Lagan to conduct background investigations on Paternal Grandparents, W.B., and any other relatives with whom Children might have contact.[26] Mr. Lagan discovered the following criminal records. In October 2009, the Commonwealth charged Paternal Grandmother with theft of services; Paternal Grandmother pled guilty in November 2009, paid a fine, $250.00 in restitution, and costs. In 2012, Paternal Grandmother pled guilty to a traffic violation. Later in 2012, the Commonwealth charged

---

[25] (*Id.* at 229-241; R.R. at 118a-124a.)

[26] Counsel for Paternal Grandparents objected to testimony/evidence concerning criminal records, but the court overruled the objection as relevant to Children's best interests.

Paternal Grandmother with bad checks; the disposition was guilty.[27]  Also in 2012, the Commonwealth charged Paternal Grandmother with operating a vehicle without required financial responsibility; that charge was dismissed. In 2013, Paternal Grandmother pled guilty to speeding (71 mph in a 55 mph zone).

Mr. Lagan did not discover any criminal history, bankruptcies, tax liens, or judgments against Paternal Grandfather.  Mr. Lagan found one child support action against Paternal Grandfather from 1998.

Mr. Lagan discovered that the Commonwealth charged W.B. with trespass by a motor vehicle in 2008; W.B. pled guilty to this offense and paid a fine and costs.  In 2010, the Commonwealth charged W.B. with harassment due to a physical altercation; W.B. pled guilty to this offense in July 2010 and paid a fine and costs.

_____

[27] Mr. Lagan shared no factual basis for the theft of services, traffic violation, and bad checks convictions.  Mr. Lagan also could not determine whether the convictions were summary offenses or misdemeanor offenses. Additionally, counsel for Paternal Grandparents confronted Mr. Lagan with a print-out from the Pennsylvania State Police dated May 15, 2012, which showed that Paternal Grandmother had no criminal record.  Mr. Lagan explained that the Pennsylvania State Police records are generally based on fingerprinting; Mr. Lagan suggested Paternal Grandmother might not have been fingerprinted for her crimes.  Mr. Lagan indicated that the Pennsylvania State Police records might be different than the records accessed through the Unified Judicial System Portal.  Neither the Pennsylvania State Police record nor the Unified Judicial System Portal record pertaining to Paternal Grandmother's convictions is part of the certified record on appeal.

Maternal Grandmother testified, *inter alia*, as follows.[28] Maternal Grandmother's relationship with Mother is currently fine, though they have had their "ups and downs" over the years. Maternal Grandmother would not permit Mother and Father to live together when Mother gave birth to K.A.T. because they were unmarried, so Mother moved in with Father at Paternal Grandmother and W.B.'s home. Mother became distraught living with Paternal Grandmother and W.B., so Mother moved out.

When Mother and Father shared custody of Children, Maternal Grandmother described the custodial arrangement as "horrible." Maternal Grandmother said Children had no set routine because they were always back and forth between homes. Maternal Grandmother said Father did not always show up for his periods of physical custody.

Maternal Grandmother said she drove Father to see Children in New York on March 20, 2012, but Father did not get out of the car. Maternal Grandmother indicated Father already knew Mother was living with Children in New York when this incident took place. Maternal Grandmother admitted Mother was upset that Maternal Grandmother brought him to see Children on this date. Maternal Grandmother said she spoke to Father again on August 18, 2012 and informed Father that Mother and Mother's Husband planned to move to Wisconsin with Children. Maternal Grandmother told

---

[28] (*Id.* at 241-257; R.R. at 124a-132a.)

Father it might be the last opportunity to see Children for a while, but Father said he did not want to see Children.[29] Maternal Grandmother denied that anyone from Father's family had ever contacted her, asking for Mother's phone number or address. Maternal Grandmother believes Mother's Husband is a great man who is good with Children and is giving Children a good life.

Mr. Wilson L. Richardson teaches Children Hapkido,[30] a martial arts class, two to three days each week. Mr. Richardson testified, *inter alia*, as follows.[31] Mr. Richardson said Mother and Mother's Husband attend the classes and watch Children more frequently than most parents do. Children are doing well in the class.

Keiton Lyle Westfall testified, *inter alia*, as follows.[32] Mr. Westfall is Father's second cousin. Mr. Westfall and Father did not spend much time together, but they always conversed when they saw each other. In speaking

---

[29] There is some inconsistency in the testimony as to whether Maternal Grandmother drove Father to see Children on March 20, 2012, or on August 18, 2012, shortly before Mother and Children moved to Wisconsin with Mother's Husband.

[30] Hapkido is a self-defense based curriculum that also teaches Children the discipline of exercise.

[31] (*Id.* at 257-261; R.R. at 132a-134a.)

[32] (*Id.* at 262-265; R.R. at 134a-136a.)

with Father, Mr. Westfall did not recall Father ever being distraught about Children or discussing a search for Children.

After Mr. Westfall's testimony, Mother rested her case. The court instructed counsel to address in closing arguments the statutory factors relating to grandparent custodial rights as well as the two or three year period in which Paternal Grandparents had no contact with Children. Regarding the lack of contact, the court stated: "And, of course, the effect of—assuming parent withholds the children from grandparents, and frankly it makes no difference whether it is hiding them or just simply saying you can't see them, it is the time lag that I'm concerned about." (*Id.* at 267; R.R. at 137a.) The court explained that it planned to make a decision immediately following closing arguments so that the parties could leave the courtroom informed of the result.

Following closing argument, the court explained its custody decision as follows:

> Now, before we had this most recent legislation, the test was actually pretty direct and somewhat simple. Upon the death of a child, the parents of the deceased child may seek reasonable partial custody to an unmarried child upon a finding that partial custody would be in the best interest of the child and would not interfere with the parent-child relationship.
>
> Court decisions instruct that the court must consider the amount of personal contact between the parents, the grandparents, and the child or children.
>
> The purpose of allowing partial custody under this is not to replace a parent with a grandparent as a primary

caregiver. And essentially what the cases were saying is natural biological parent trumps grandparent for primary physical custody, period.

But as it relates to partial physical custody, that was to continue a healthy relationship with grandparents if that was in the child's best interest and would not interfere with the parent's relationship. And the statute was then apparently replaced by this new one with these factors.

And I'm sorry. I have to say this. When I started reviewing the code when I got this assignment, my first reaction was the legislature has embarked upon an unconstitutional encroachment of the court's authority. They are telling us what we must consider to make a decision.

I'm not sure—the example came to mind is for example if the legislature said we're going to control fat people. So anybody who makes a personal injury claim in an automobile accident case, you've got to consider whether they are fat or not. Now what the heck does that have to do with somebody's injuries? And some of the factors, I'm sorry, that I have reviewed I'm shaking my head saying what the heck does this have to do with the best interest of the children? Oh, it controls the conduct of the adults because the adults can't act like adults. So we'll dictate how the adults will act and call it in the best interest of the children.

I'm tempted to just rule, [Paternal Grandparents' counsel], because I know you are a competent, qualified, good practitioner in the area of family law that this is all unconstitutional because it infringes upon my authority to make a decision. Any I may find the case that I will do that.

But nevertheless, the legislature has enacted these factors. You addressed them. Now, as [Mother's counsel] pointed out, there is no testimony on some of the stuff because it doesn't exist. All right. So we pass over those and we look at the factors and we do so with the understanding that grandparents have the burden of proof in these areas.

There is a curious circumstance that comes to mind. If a biological parent—I'm not saying that's the case here. But if a biological parent intentionally creates conflict and estrangement with that biological parent's former in-laws, do they get punished for what they did by saying we're going to ignore the conflict because biological parent created it and we're still going to give partial physical custody to grandparents knowing there is an irreconcilable conflict and then say you live with it? I don't think that is in the best interest of the children.

Which brings me back to finally all well and good, here are the factors you[,] that you consider. How do you consider them? Who caused what? That is part of the equation. That is part of the discussion. I guess as I get more educated in this area, I'll answer that question for myself.

But the facts are that I would find from the testimony there is contact between [Paternal Grandmother] and there has been literally no contact with [Paternal Grandfather]. And he's—I don't mean to be disrespectful to you. You're sort of the passenger sitting in the car and your former wife is driving it. And in whichever direction she ends, that's where you're going. That's another circumstance.

We have divorced grandparents involved with significant others living in separate households, both of them are Plaintiffs. And yet they solved the apparent problem of splitting time with them by their own agreement that if they get partial physical custody, the kids are going to stay overnight with [P]aternal [G]randmother and [P]aternal [G]randfather will come and pick them up and be with them during the day while [Paternal Grandmother] works. That doesn't sound like it has…much court supervision at all, but nobody is asking me to get involved in that because they've agreed. So I don't have the dilemma of saying let me figure out…how to split time with grandfather, grandmother, Skype calls. He goes over to her place, and they participate in these Skype calls.

That's another thing. I'm sorry. This micromanaging contacts over the phone and Skype and all that stuff, you just can't be all things to all people. And from the

evidence, I do accept [M]other's testimony that these Skype calls are upsetting. They are an interruption of their routine. And I can appreciate that.

How do you have a conversation with a 4-year-old? Hi. How are you? Tell me what you did today. What do you think of the Middle East situation? Four-year-olds don't have conversations with people in most instances. They report. I played. I like the puzzle. I like my bat. I like the ball. I watched the Muppets. They are not on [TV] anymore or whatever, whoever.

But 6-year-olds are starting to have conversations. They are going to school. They are in kindergarten, first grade. This Skype technology, I heard the evidence. And I heard, oh yeah, we'll get you the right device and this will all work. Mom refused that. But then she doesn't apparently know how to use her phone to make it work. But then I heard testimony that it doesn't work for group calls with phones.

And I will tell you what my concern was when I heard all of that testimony and there was I believe you said you could get up to ten people on a call if you're on a computer. Ma'am, in my judgment, that is overload. You get ten people yammering at a 4-year-old, all visual, all seeing, all that. To me, I can't comprehend how that would impact a 4-year-old.[33]

All right. Where am I? Well, I'm analyzing the evidence in front of me. There is no question there is a conflict between the two. I'm calling them households even though I know [Paternal Grandparents have] two households. Conflict between the households.

One thing that I will tell you struck me and was concerning to me, [M]other's current husband has been described as a

---

[33] No testimony established that Paternal Grandparents placed or intended to place ten people on the Skype calls while the interim custody order was in effect. Rather, testimony explained that the "group call" function on Skype allows **up to** ten people to participate on a call.

good father, doing a good job, accepting of these children. And he stepped up to adopt these children and apparently, according to evidence, had got an order allowing him to adopt the children. And [Paternal G]randparents couldn't just let that go. They had to go in and undo that to get it vacated. To what end?

And my reaction was real simple to that. They stuck their nose in that situation and probably they should have stayed the hell out of it. Their—I can't say daughter-in-law but their son's paramour and their grandchildren are in a stable family, legally married, doing the right thing to adopt these boys. And [Mother's Husband] steps up and for whatever reasons, you undid it. I don't believe that could possibly be considered a best interest for your grandchildren in any way, shape, or form.

Yes, I read the section. One notation. I do agree [Mother's counsel] referred [to] grandparent considerations under the 5328 subsection, but you said as well as the other general factors.

If I am compelled to use the factors that the legislature set up, I'm not looking beyond what the statute says.

And the statute says grandparents factors. Fine. If I'm told I have to use those factors, I'm not going back and looking at general factors because I don't think I should anyway be compelled to.

But the bottom line is this. There is a conflict between [Paternal G]randmother and [M]other. Who created it? Even if I say [M]other, still is a fact. Now I don't necessarily believe that [M]other created the conflict.

And even if she did and her perception is wrong, what is the old saying[,] perception becomes reality[,] is reality. Now, what am I to do with that, say [M]other you have got to make it up with your former paramour's mother? Gee, I'm sure that will work. Wait a minute, counseling. We'll make you spend money for counseling to heal this rift.

Well, [Paternal G]randmother is in Erie. Excuse me. [Corry], close to Erie.—

* * *

Corry. And [Mother] is in Hanover. How is that going to work? Oh, let's make everybody drive three hours to get at a middle point and find some counselor to talk to these people for an hour and send them back on their way. That will give them a lot of time to think while they are driving back and forth. That is not going to work.

So bottom line is this. Right or wrongly, I don't believe that the conflict between [M]other and [P]aternal [G]randmother can be fixed. And I don't think, therefore, it is in the best interest to trump [M]other's decision not to give access to grandparents simply because grandparents want to establish a relationship with their grandchildren. I don't see any need. Mother needs no help. She has a new husband. He's doing good by her. They are stable, adding to their family.[34] So I'm not going to interfere with her decision.

She is [C]hildren's mother. And I don't see any reason, even considering all of these factors that I'm supposed to think about, to conclude that [C]hildren would be better or it would be in their best interest to be compelled to spend regulated time with grandparents, nor for that matter have dictated times for contact on the phone.

So having said all of that, the bottom line order is this.

## ORDER

AND NOW, to wit, this 10th day of February, 2014, the complaint for custody filed by [Paternal Grandparents] is dismissed. We will enter no order of partial physical custody.

* * *

---

[34] Mother was pregnant at the time of the custody trial.

- 35 -

(*Id.* at 289-298; R.R. at 148a-152a.)[35]

On March 7, 2014, Paternal Grandparents timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Paternal Grandparents raised four issues in their concise statement challenging: (1) the court's decision to sever all ties between Children and their Paternal Grandparents' ancestry; (2) the court's admission of evidence of criminal and motor vehicle offenses; (3) the court's failure to consider the Custody Act's statutory factors and to conduct a detailed analysis; and (4) the court's exclusive focus on the conflict between Mother and Paternal Grandparents. On March 24, 2014, the court issued a responsive Pa.R.A.P. 1925(a) opinion. In its opinion, the court stated:

> We have reviewed our Decision and feel no need presently to elaborate further. As the issues are styled, we would take the opportunity to offer some generalized comments and observations. Simply put, this Judge believes that the legislature has unduly encroached upon the judiciary and the way Judges are to perform their responsibilities. To state the issues of error as failing to conduct a detailed child custody analysis as required misdirects the focus away from the sole question of what is in the best interests of children. …
>
> Since it is unlikely a litigant would directly challenge "the factors" (23 Pa.C.S. 5328), in the context of the issues

---

[35] Prior to trial, the parties had filed motions for contempt. Mother filed for contempt, alleging Paternal Grandparents had smoked in front of Children. Paternal Grandparents filed for contempt based on Mother's alleged interference with the visual capabilities of the Skype calls. The court denied both petitions for contempt at the conclusion of trial, finding insufficient evidence to substantiate either claim.

styled, it is hoped this appeal may address the threshold question[:] can the legislature do what this law purports to do? The development of custody law, as is so with the common-law, was unquestionably within the province of the judiciary. An absolute preclusion from primary custody when a parent moved in the paramour[,] evolved to a more precise consideration of what is the effect of such a meretricious relationship on children. While the judiciary may have struggled with shifting social [mores], the Courts never lost focus that the paramount question was and always will be[,] what is in the best interest of children.

* * *

This is not a new challenge for the Courts. When called upon, it has been decided by the Superior Court that legislation is not the end all be all. In considering a natural parent's petition to resume custody of his or her children, the best interest of the child standard was applicable rather than the clear necessity standard as set out in the Juvenile Act (42 Pa.C.S.A. 6301 *et seq.*).

Perhaps in hindsight, this Judge should have declared outright in this case that "the factors" would not be considered and thus pre[v]ented the precise question being asked now. What we did do is consider the evidence and arguments presented by the litigants and to the best of our human ability decide what was in the best interest of these two boys. We do not think we were wrong in the result or how we got there.

(Rule 1925(a) Opinion, filed March 24, 2014, at 2-5) (some internal citations omitted).

On September 16, 2014, this Court vacated and remanded the matter, based on the trial court's failure to utilize the requisite statutory factors in making its determination. Specifically, this Court instructed the trial court to consider upon remand the sixteen general statutory "best interest" factors

applicable when making any order of custody (**see** 23 Pa.C.S.A. § 5328(a)) **and** the three statutory custody factors pertaining to grandparents and great-grandparents (**see** 23 Pa.C.S.A. § 5328(c)(1)). Based on its disposition, this Court declined to address the merits of any of Paternal Grandparents' issues.

On November 6, 2014, the trial court issued its remand decision. The trial court's remand decision provides no facts or procedural history of the case. The remand decision initially references the closing arguments of counsel and incorporates by reference the court's on-the-record discussion at the conclusion of the custody trial. The court's remand decision continues, in its entirety and without any discussion of legal authority whatsoever, as follows:

> We then reference the grandparents' factors in Section 5328(c)(1) of the Child Custody Act. We consider the three subsections as follows: (i) none for approximately 3 years; (ii) interference would result to the parent/child relationship as it did when grandparents intervened in a finalized adoption by Mother's current husband resulting in the adoption being undone and still pending at the time of this custody trial; (iii) awarding custody to grandparents would not be in the best interest of the children. The analysis however, does not end there and we continue to consider the 16 factors set forth at pages 4-6 of the Superior Court Opinion. We will address each factor *ad seriatum*.
>
> Factor 1:    Neither party is more likely to encourage and promote frequent and continuing contact.
>
> Factor 2:    There exists no risk of physical harm to the children, though efforts to influence a child's thinking may possibly create emotional stress.

- 38 -

Factor 3: Grandparents have performed no parental duties for at least three years, while Mother has.

Factor 4: Grandparents are unnecessary to provide stability and continuity in [Children's] education, family life and community life as circumstances present at trial. Mother provides for those.

Factor 5: Grandparents (and others) are the extended family, 5½ travel hours away. Mother's current husband completes the traditional family unit of husband and wife and children. There is no evidence they need help from any outside source.

Factor 6: There is no reason to believe [C]hildren's relationship is anything but good and at the time of trial a third sibling was expected. We fail to see how grandparents add anything to the sibling relationships.

Factor 7: There was no evidence presented as to the well-reasoned preference of [C]hildren.

Factor 8: Not applicable.

Factor 9: Mother is more likely to maintain a loving, stable, consistent and nurturing relationship "adequate" for [C]hildren's emotional needs.

Factor 10: Mother is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of [C]hildren. Need it be stated, Grandparents are 5½ hours away.

Factor 11: The parties [live] at least 5½ travel hours apart.

Factor 12: While each party may have the ability to make appropriate child-care arrangements and be "available," as written, we do not believe this subsection permits us to rewrite the statute to address quality of care. However, *see* factor 9.

Factor 13: There exists a high level of conflict between the parties, more so with [Paternal Grandmother] than with [Paternal Grandfather]. While the parties may state a willingness to cooperate, we are unpersuaded that there exists the ability to cooperate.

Factor 14: While there was evidence presented about past drug and alcohol use/abuse, adequate evidence of present circumstances is lacking.

Factor 15: While [Paternal G]randfather may have some difficulties getting around, there is no evidence that any party or household member is mentally impaired or physically incapable.

Factor 16: No other relevant factors exist of significance.

Following then the directive to properly consider [Children's] best interest in light of the statutory factors, we have done so. To answer this question we have balanced each factor singularly and in toto in each to the other and as each may apply to the underlying circumstances presented. Considering then the evidence presented as to the subject matter of each factor and further considering the arguments of counsel, we do conclude that it is not in the best interests of these children to be compelled by court order to spend times of partial physical custody with [Paternal] Grandparents. An appropriate Order dismissing [Paternal G]randparents' complaint follows hereinafter.

(Remand Decision, filed November 6, 2014, at 1-4). Paternal Grandparents timely filed a notice of appeal and Rule 1925(a)(2)(i) statement on December 5, 2014. On December 17, 2014, the trial court issued a supplemental opinion, commenting only on its evidentiary rulings concerning the criminal offenses of Paternal Grandmother and W.B. (**See** Supplemental Rule 1925(a) Opinion, filed December 17, 2014, at 1-2.)

Paternal Grandparents raise the following issues for our review:

WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION OR AN ERROR OF LAW BY FAILING TO PROPERLY ANALYZE THE CUSTODY FACTORS SET FORTH IN 23 PA.C.S. § 5328(a) AND (c) OF THE CUSTODY ACT, AS AMENDED, ON REMAND, AS DIRECTED BY THE SUPERIOR COURT OF PENNSYLVANIA WHEN THE TRIAL COURT MERELY ENGAGED IN A CURSORY AND PERFUNCTORY ANALYSIS RATHER THAN THOROUGHLY EXAMINING AND CONSIDERING ALL FACTORS AS SET FORTH IN § 5328(a) AND (c), AND IN ACCORDANCE WITH THE STANDARD OF WHAT IS IN CHILDREN'S BEST INTERESTS?

WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION OR AN ERROR OF LAW IN FAILING TO GRANT PATERNAL GRANDPARENTS ANY RIGHTS OF PARTIAL PHYSICAL CUSTODY, WHICH, IN EFFECT, CUTS CHILDREN OFF FROM THEIR PATERNAL ANCESTRY AND IS CONTRARY TO THE BEST INTEREST[S] OF CHILDREN AND IS IN CONTRAVENTION OF WELL-SETTLED CASE LAW AND THE PURPOSE OF 23 PA.C.S. § 5325?

WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION OR AN ERROR OF LAW BY REPEATEDLY ALLOWING THE ADMISSION OF EVIDENCE (OVER OBJECTIONS) OF CRIMINAL AND MOTOR VEHICLE OFFENSES NOT ENUMERATED IN 23 PA.C.S. § 5329 AND WHICH WERE NOT OTHERWISE ADMISSIBLE UNDER THE RULES OF EVIDENCE?

(Paternal Grandparents' Brief at 4).

For purposes of disposition, we combine Paternal Grandparents' first and second issues. Paternal Grandparents argue the legislature recognized a beneficial relationship between children and their grandparents when it gave grandparents standing under 23 Pa.C.S.A. § 5325, in the event of a parent's death. Paternal Grandparents assert the trial court wholly ignored

the importance of their role in Children's lives. Paternal Grandparents contend the court's custody decision effectively severed all ancestral ties between Children and Father's family because Mother and Mother's Husband have made clear they will not permit Paternal Grandparents to have any contact or communication with Children in the future.

Paternal Grandparents also argue that the court's decision following remand fails to set forth a detailed analysis to support the court's decision to deny Paternal Grandparents any contact with Children. With respect to the trial court's initial consideration of the grandparent factors (*see* 23 Pa.C.S.A. § 5328(c)(1)), under Section 5328(c)(1)(i) (amount of contact between child and grandparent prior to filing of custody action), Paternal Grandparents assert the court merely stated Paternal Grandparents have not had contact with Children for approximately three years. Paternal Grandparents aver the court ignored their substantial contact with Children prior to the custody action, where K.A.T. resided with Paternal Grandmother and W.B. for one year and Paternal Grandparents provided care for both Children when Mother and Father shared physical custody after their separation in 2009. Paternal Grandparents claim their lack of contact with Children in recent years stemmed from Mother's repeated moves and refusal to inform Paternal Grandparents of her contact information and whereabouts. Paternal Grandparents stress how they needed to hire a private investigator to locate Mother and Children after Father's death.

Under Section 5328(c)(1)(ii) (whether custody award interferes with parent-child relationship), Paternal Grandparents complain the trial court improperly focused on Paternal Grandparents' intervention with the adoption proceedings by Mother's Husband. Paternal Grandparents insist the trial court blamed them for asserting their rights under the adoption statute to provide testimony regarding whether Mother's Husband would be an appropriate adoptive parent. Paternal Grandparents maintain that Mother's and Mother's Husband's failure to notify Paternal Grandparents about the adoption proceedings (which resulted in the court vacating the adoption decree) deprived Paternal Grandparents of an opportunity to participate in the determination of whether adoption by Mother's Husband would serve Children's best interests. Paternal Grandparents suggest their intervention in the adoption proceedings was especially necessary in light of Mother's Husband's inflammatory racist comments on Facebook.

Regarding Section 5328(c)(1)(iii) (whether custody award is in best interest of child), Paternal Grandparents recite the court's entire analysis of this factor as follows: "awarding custody to grandparents would not be in the best interest of children." Paternal Grandparents contend the "best interest of the child" determination is the polestar criterion in custody cases, and the court's bare assertion is woefully inadequate.

Paternal Grandparents proclaim the court was also required to analyze all of the sixteen statutory custody factors under Section 5328(a). Paternal

Grandparents highlight the trial court's initial remarks on the record that it would not consider the sixteen custody factors and would consider only the three factors related to grandparents seeking custody. When compelled to do so by this Court, the trial court mentioned the sixteen factors in its remand decision but provided no detail or analysis of the factors, and no references to the record. Paternal Grandparents maintain the court's decision after remand falls far short of a thorough analysis.

Paternal Grandparents further suggest the record does not support the court's conclusory statements as to certain factors.[36] For example, Paternal Grandparents suggest that factor one (which party is more likely to encourage and permit frequent and continuing contact between child and another party) actually favors Paternal Grandparents, as Mother admitted she will not permit Paternal Grandparents to see Children; the court erroneously concluded this factor favored neither party. Regarding factor three (parental duties performed by each party on behalf of child), the court concluded Paternal Grandparents performed no parental duties for three years, but Paternal Grandparents maintain the court ignored Mother's

_____

[36] The court determined there was no evidence presented relevant to the court's analysis of factor 2 (present and past abuse committed by party or member of party's household), factor 7 (well-reasoned preference of child), factor 14 (history of drug or alcohol abuse of party or member of party's household), and factor 15 (mental and physical condition of party or member of party's household). The court did not mention factor 2.1 (related to child abuse and involvement with protective services) in its decision following remand.

repeated moves and efforts to exclude Paternal Grandparents from Children's lives as well as Paternal Grandparents' efforts to locate Mother and Children. As to factor four (need for stability and continuity in child's education, family life and community life), the court said Paternal Grandparents were "unnecessary" for Children's stability and continuity. Paternal Grandparents aver the amount of custodial time awarded to Paternal Grandparents under the interim custody order does not disrupt Children's lives, and the court failed to consider any benefit to Paternal Grandparents' involvement in Children's lives.

Paternal Grandparents contend the court also ignored evidence of Children's extended family on Father's side, who reside in Erie County (relative to factor five), when the court simply concluded: "Mother's current husband completes the traditional family unit of husband and wife and children. There is no evidence they need help from any outside source." Paternal Grandparents explain the court indicated that Paternal Grandparents add nothing to Children's sibling relationships (relative to factor six); Paternal Grandparents submit this factor is inapplicable in the context of a case where grandparents seek only partial physical custody.

Regarding factor eight (attempts of parent to turn child against other parent), the court concluded this factor was inapplicable, but Paternal Grandparents suggest the record is replete with examples of Mother's efforts to turn Children against them by excluding Paternal Grandparents from

Children's lives.  With respect to factor nine (which party is more likely to maintain loving, stable, consistent and nurturing relationship with child adequate for child's emotional needs), Paternal Grandparents contend both parties demonstrated adequate parenting skills, but the court inexplicitly determined factor nine favored Mother, without consideration of Paternal Grandparents' loving relationship with Children.  In deliberation of factor ten (which party is more likely to attend to daily physical, emotional, developmental, educational and special needs of child), Paternal Grandparents complain the court failed to consider Paternal Grandparents' ability to care for Children during their periods of partial physical custody.  Instead, the court focused on the distance between the parties.  Paternal Grandparents claim the trial court impermissibly relied primarily on the distance between the parties in its discussion of three of the sixteen factors,[37] when distance is relevant only to factor eleven.  Even as to factor eleven (proximity of residences of parties), Paternal Grandparents insist their request for partial physical custody as dictated under the interim custody order is reasonable in light of the distance between the parties.

Concerning factor twelve (each party's availability to care for child or ability to make appropriate child-care arrangements), Paternal Grandparents claim this factor is neutral because Paternal Grandparents will be available to

_____

[37] The court mentioned the distance between the parties' residences in its consideration of factors five, ten, and eleven.

care for Children during their periods of partial physical custody and have already agreed to a joint schedule during those periods.[38] Paternal Grandparents aver the court erroneously concluded that no party to this custody action has the ability to cooperate (relative to factor thirteen). To the contrary, Paternal Grandparents declare that they have been cooperative with Mother, but Mother remains uncooperative with Paternal Grandparents, in an effort to keep them away from Children.

Regarding factor sixteen (any other relevant factor), the court said no other relevant factors of significance exist. Paternal Grandparents submit the court ignored, *inter alia*, Mother's unsubstantiated allegations that Paternal Grandparents' conduct during the interim custody order caused Children to suffer emotional harm and behavioral issues, Mother's and Mother's Husband's outright refusal to permit Paternal Grandparents any contact with Children whatsoever, Mother's efforts to exclude Paternal Grandparents from Children's lives over the years preceding the current custody action, and Mother's Husband's racially derogatory comments on Facebook. Paternal Grandparents conclude the trial court's remand decision is severely deficient and unsupported by the record, and this Court must reverse the trial court's custody decision and award Paternal Grandparents

_____

[38] The trial court conceded that both parties might have the ability to make appropriate child-care arrangements and be "available," but then the court referred back to its analysis of factor nine, favoring Mother. (**See** Remand Decision, filed November 6, 2014, at 3.)

partial custody in accordance with the terms of the interim custody order.[39]

We agree.

In custody cases, the relevant scope and standard of review are as follows:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa.Super. 2001)). "On issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." *R.M.G., Jr., supra*.

> The parties cannot dictate the amount of weight the trial court places on the evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

---

[39] At the custody trial, Paternal Grandparents asked for additional custodial time with Children, but on appeal they seek only the custodial time awarded under the interim custody order. (*See* Paternal Grandparents' Brief at 65.)

*Id.* (quoting *S.M. v. J.M.*, 811 A.2d 621, 623 (Pa.Super. 2002)). "Indeed, our admittedly circumscribed standard of review does not preclude this Court from finding that a trial court abused its discretion in fashioning a custody order. While prudence dictates that we exercise our authority sparingly, we are not powerless to rectify a manifestly unreasonable custody order." *V.B. v. J.E.B.*, 55 A.3d 1193, 1200 (Pa.Super. 2012). "Ultimately, the test is 'whether the trial court's conclusions are unreasonable as shown by the evidence of record.'" *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa.Super. 2006) (quoting *Dranko v. Dranko*, 824 A.2d 1215, 1219 (Pa.Super. 2003)).

The statutory presumption favoring an award of custody to parents over third-parties is not applicable to the current case because Paternal Grandparents seek only partial physical custody of Children. *See* 23 Pa.C.S.A. § 5327(b) (setting forth presumption in cases concerning primary physical custody). The Child Custody Act ("Act") provides:

### § 5328. Factors to consider when awarding custody

**(a) Factors.–**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2)   The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)   The parental duties performed by each party on behalf of the child.

(4)   The need for stability and continuity in the child's education, family life and community life.

(5)   The availability of extended family.

(6)   The child's sibling relationships.

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)   The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)   Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from

abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

\*   \*   \*

**(c)  Grandparents and great-grandparents.—**

(1)   In ordering partial physical custody or supervised physical custody to a party who has standing under section 5325(1) or (2) (relating to standing for partial physical custody and supervised physical custody), the court shall consider the following:

(i)   the amount of personal contact between the child and the party prior to the filing of the action;

(ii)   whether the award interferes with any parent-child relationship; and

(iii)   whether the award is in the best interest of the child.

\*   \*   \*

23 Pa.C.S.A. § 5328(a), (c)(1).  Thus, when deciding an award of custody, the court must conduct a thorough analysis of the best interests of the child based on the factors set forth in the Act.  *E.D. v. M.P.*, 33 A.3d 73 (Pa.Super. 2011).  "**All** of the factors listed in [S]ection 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa.Super. 2011) (emphasis in original).

Nevertheless, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013).

Further, "in the recent past, grandparents have assumed increased roles in their grandchildren's lives and our cumulative experience demonstrates the many potential benefits of strong inter-generational ties." *Hiller v. Fausey*, 588 Pa. 342, 360, 902 A.2d 875, 886 (2006), *cert. denied*, 549 U.S. 1304, 127 S.Ct. 1876, 167 L.Ed.2d 363 (2007). Thus:

> While acknowledging the general benefits of these relationships, we cannot conclude that such a benefit always accrues in cases where grandparents force their way into grandchildren's lives through the courts, contrary to the decision of a fit parent. In contrast, however, **we refuse to close our minds to the possibility that in some instances a court may overturn even the decision of a fit parent to exclude a grandparent from a grandchild's life, especially where the grandparent's child is deceased and the grandparent relationship is longstanding and significant to the grandchild**.

*Id.* at 360, 904 A.2d at 886-87 (internal footnote omitted) (emphasis added). *See also Commonwealth ex. rel. Goodman v. Dratch*, 159 A.2d 70, 71 (Pa.Super. 1960) (stating: "Unless there [is] some compelling reason, we do not believe that a grandchild should be denied visitation to his grandparents").

Additionally, in the context of custody proceedings, "[h]ostilities between the [parties] are relevant only insofar as they constitute a threat to the child or affect the child's welfare." ***Nancy E.M. v. Kenneth D.M.***, 462 A.2d 1386, 1388 (Pa.Super. 1983). Importantly:

> A custodial parent's suspicion of or animosity towards another parent or third party seeking visitation should not alone warrant denial of visitation; otherwise the custodial parent could always effectively deny visitation simply by testifying to suspicion or animosity. Instead of deferring to suspicion or animosity, the hearing judge must try to determine whether there is any basis for these feelings. Stated more broadly, **the judge must appraise whether the relationship between the disputing parties has an adverse effect on the child**.
>
> \*   \*   \*
>
> Except under unusual circumstances, no child should be cut off entirely from one side of [his or her] family. [V]isits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. If animosities continue between the parties, **and result in adverse [e]ffects on [the child]**…, a visitation order may be revised, even to the extent of retracting visitation.

***Commonwealth ex. rel. Williams v. Miller***, 385 A.2d 992, 995 (Pa.Super. 1978) (internal citations omitted) (emphasis added) (reversing trial court order denying maternal grandmother visitation with grandchild following mother's death; maternal grandmother offered sufficient reasons why visitation with child for one weekend each month would serve child's best interests; record did not support trial court's finding that maternal

grandmother abandoned mother; father's "mistrust" of maternal grandmother was not valid reason for denying her visitation; trial court failed to provide sufficient consideration to unusual facts of case; and if enforcing visitation away from child's home presents harmful effects on child, then trial court may specify place and conditions of visitation). *See also Johnson v. Diesinger*, 589 A.2d 1160 (Pa.Super. 1991) (explaining how rivalry between parents and grandparents for child's affection can be devastating; when animosity exists, appropriate inquiry is not where to place blame, but how does animosity affect best interests of children).

Instantly, the court announced at the start of the custody trial that it had not presided over a custody trial in the past five years, and the court was dissatisfied with the legislature's enactment of the Act since the court had last presided over a custody trial. (*See* N.T., 2/10/12, at 12; R.R. at 9a) (stating: "I have personal reservations as to whether the legislature can tell me how to make a decision"). Following the conclusion of closing arguments, the court again expressed disdain with the Act. (*See id.* at 290-91; R.R. at 148a-149a) (stating: "I'm tempted to just rule…that this is all unconstitutional because it infringes upon my authority to make a decision"). During the court's on-the-record remarks, the court acknowledged the existence of the statutory factors at Sections 5328(a) and 5328(c)(1), but went on to state that it would consider **only** the statutory factors pertaining to grandparents' rights. (*Id.* at 295; R.R. at 151a) (stating: "If I am

compelled to use the factors that the legislature set up, I'm not looking beyond what the statute says. And the statute says grandparents factors. Fine. If I'm told I have to use those factors, I'm not going back and looking at general factors because I don't think I should anyway be compelled to"). At the conclusion of trial, the court dismissed Paternal Grandparents' custody complaint, awarding them no periods of partial physical custody.

After Paternal Grandparents filed their notice of appeal, the trial court issued a Rule 1925(a) opinion, once again expressing contempt with the Act as "unduly encroach[ing] upon the judiciary and the way [j]udges are to perform their responsibilities." (Rule 1925(a) Opinion at 2). In its opinion, the trial court declined to analyze **any** of the factors set forth in Section 5328(a) or Section 5328(c)(1). Instead, the court simply concluded: "What we did do is consider the evidence and arguments presented by the litigants and to the best of our human ability decide what was in the best interest of these two boys. We do not think we were wrong in the result or how we got there." (**Id.** at 5).

On September 16, 2014, this Court vacated and remanded the matter, based on the trial court's failure to utilize the requisite statutory factors in making its determination. Specifically, this Court instructed the trial court to consider upon remand the general statutory "best interest" custody factors set forth at Section 5328(a) **and** the three statutory custody factors pertaining to grandparents at Section 5328(c)(1).

On November 6, 2014, the trial court issued its decision after remand. Significantly, the trial court's remand decision provides no facts or procedural history of the case. (**See** Remand Decision at 1-4.) Similarly absent from the court's decision after remand are any express credibility determinations.[40] The court also supplies no law whatsoever. (**See** Remand Decision at 1-4.) Rather, the court issues mere conclusory statements as to each factor under Section 5328(a) and Section 5328(c)(1). (**See id.**) Our review of the court's decision after remand leaves questionable whether the court engaged in a thoughtful analysis of, and gave due consideration to, each relevant factor, where the court offered no facts of record or analysis to support its conclusions. **See M.J.M., supra**; **J.R.M., supra**; **E.D., supra**. The court's decision after remand appears to pay mere lip service to this Court's remand directive. Under these circumstances, the trial court's remand decision is deficient. **See M.J.M., supra**; **J.R.M., supra**; **E.D., supra**.

More importantly, many of the trial court's conclusory statements do not accurately reflect the evidence presented at trial. For example, the court's bald statement regarding Section 5328(c)(1)(i), that Paternal Grandparents have had no contact with Children for approximately three

---

[40] The sole reference to a party's credibility determination appears in the midst of the court's on-the-record remarks at the conclusion of trial, where the court accepted as true Mother's testimony that the Skype calls were upsetting to Children. (**See** N.T., 2/10/14, at 293; R.R. at 150a.)

years (*see* Remand Decision at 1), lacks necessary context. Specifically, the court ignores, *inter alia*, the following evidence: (1) Mother and K.A.T. lived with Paternal Grandmother and W.B. for one year; (2) Paternal Grandparents spent substantial time with Children when Mother and Father shared physical custody; (3) Mother repeatedly moved around the country and refused to disclose (or to permit Father to disclose) her contact information to Paternal Grandparents; and (4) Paternal Grandparents had to hire a private investigator to locate Mother and Children in the aftermath of Father's death. The court similarly ignores this evidence concerning its finding at Section 5328(a)(3) (parental duties performed by each party on behalf of child), where the court simply states: "Grandparents have performed no parental duties for at least three years, while Mother has." (Remand Decision at 2).

Under Section 5328(a)(1) (which party is more likely to encourage and permit frequent and continuing contact between child and another party), the trial court found this factor favored neither party. (*See* Remand Decision at 2.) Nevertheless, the record discloses that this factor favors Paternal Grandparents, as the evidence presented at trial shows they have made efforts to cooperate with Mother during the pendency of the interim custody order. Conversely, Mother and Mother's Husband demonstrated their opinion that Paternal Grandparents are "horrible," and testified that

they will not permit Paternal Grandparents to have any contact with Children in the future (presumably, unless compelled to do so by court order).

Regarding Section 5328(a)(9) (which party is more likely to maintain loving, stable, consistent and nurturing relationship with child adequate for child's emotional needs), Section 5328(a)(10) (which party is more likely to attend to daily physical, emotional, developmental, educational and special needs of child), and Section 5328(a)(12) (each party's availability to care for child or ability to make appropriate child-care arrangements), the trial court announced, with little or no explanation, that each of these factors favored Mother. (*See* Remand Decision at 3.) Significantly, the trial court made no factual findings concerning Paternal Grandparents' ability to care for and support Children during their periods of partial physical custody. (*See id.*) Nothing in the record suggests Paternal Grandparents are unable to or would have difficulty providing care for Children. Paternal Grandmother and Paternal Grandfather want to be part of Children's lives and have amicably worked out a schedule regarding the care for Children during their periods of partial physical custody.

Further, the court's decision following remand focuses on certain factors, to the detriment of other relevant factors. For example, the court placed great emphasis on the distance between the parties, which the court mentioned in its consideration of factors five, ten, and eleven. (*Id.* at 2-3.) We fail to see how proximity is relevant to factor five (availability of

extended family) and factor ten (which party is more likely to attend to daily physical, emotional, developmental, educational and special needs of child), in the context of Paternal Grandparents' request for limited partial physical custody of Children.[41]  *Compare Durning v. Balent/Kurdilla*, 19 A.3d 1125 (Pa.Super. 2011) (explaining that award of **shared** physical custody of school-aged child of parents who do not live in geographical proximity to each other is contrary to child's need for continuity at home and at school). As well, the court relied heavily on the conflict between the parties, determining the conflict could not be resolved.  (**See** N.T., 2/10/14, at 295-97; R.R. at 151a-152a) (stating: "So bottom line is this.  Right or wrongly, I don't believe that the conflict between [M]other and [P]aternal [G]randmother can be fixed"); (**see also** Remand Decision at 3) (regarding analysis of Section 5328(a)(13), stating: "While the parties may state a willingness to cooperate, we are unpersuaded that there exists the ability to cooperate").  Absent from the court's remarks, however, is an appropriate analysis of why the conflict exists and why it adversely affects Children.  **See Johnson, supra**; **Nancy E.M., supra**; **Miller, supra**.

The court also seemed to base its decision largely on Paternal Grandparents' unwelcome intervention with the adoption proceedings.  (**See** N.T., 2/10/14, at 294-95; R.R. at 150a-151a) (stating: "And my reaction

---

[41] Maternal Grandmother also lives in Erie County, Pennsylvania.

was real simple to that. They stuck their nose in that situation and probably they should have stayed the hell out of it"); (*see also* Remand Decision at 1) (regarding analysis of Section 5328(c)(1)(ii), stating: "interference would result to the parent/child relationship as it did when grandparents intervened in a finalized adoption by Mother's current husband resulting in the adoption being undone and still pending at the time of this custody trial"). The court's comments are shocking in light of some of the disturbing testimony about Mother's Husband's gravely inappropriate posts on Facebook (which he admitted writing), especially where W.B. is African-American.

The court failed to consider, however, the important contribution Paternal Grandparents can make in Children's lives, particularly since their Father's death. With respect to Section 5328(a)(4) (need for stability and continuity in child's education, family life and community life), the court coldly stated: "Grandparents are unnecessary to provide stability and continuity in the child's education, family life and community life as circumstances present at trial. Mother provides for those." (*Id.* at 2.) Concerning Section 5328(a)(5) (availability of extended family), the court explained: "Grandparents (and others) are the extended family, 5½ travel hours away. Mother's current husband completes the traditional family unit of husband and wife and children. There is no evidence they need help from any outside source." (*Id.*) The court's conclusory statements discount the significant benefits Children can reap from Paternal Grandparents, who can

provide Children ties to their deceased Father. *See Hiller, supra*; *Nancy E.M., supra*. Additionally, the court disregarded evidence of Father's extended family living near Paternal Grandparents; Children could interact with Father's relatives during Paternal Grandparents' periods of partial physical custody.

Based on this record, we cannot agree that the court made a reasoned decision based on the evidence presented, particularly in light of Pennsylvania's strong public policy favoring grandparent involvement in a child's life. *See Hiller, supra*; *Miller, supra*; *Dratch, supra*. *See also V.B., supra*; *Ketterer, supra*. Therefore, we are compelled to reverse the trial court's decision to deny Paternal Grandparents' request for partial physical custody of Children, and remand for the court to enter the interim custody order dated October 4, 2013 and entered October 7, 2013, as a final order.

In their third issue, Paternal Grandparents acknowledge that in making a custody determination, a court must consider whether a party seeking custody poses a threat of harm to the child based on certain enumerated prior criminal convictions. Paternal Grandparents explain that 23 Pa.C.S.A. § 5329(a) lists thirty-two enumerated offenses for the court to consider when making this assessment. Paternal Grandparents emphasize that the statute enumerates only misdemeanor and felony offenses and does not list any summary offenses. Paternal Grandparents maintain that under Section

5330, one party who has obtained information about a criminal charge filed against the other party may move for a temporary custody order or modification of an existing custody order (pending a hearing), but only where the other party has been charged with an offense under Section 5329(a). Read together, Paternal Grandparents contend the legislature limited the relevance of criminal convictions to only those offenses enumerated in Section 5329(a), in awarding custody. Paternal Grandparents argue that, even where a party seeking custody has a criminal conviction for an enumerated offense, the court is not precluded from granting that party custody; instead, the court shall consider the party's conduct relative to the offense to determine whether the party poses a threat of harm to the child. Only when a parent has been convicted of murder of the other parent can the court deny custody without considering threat of harm (**see** 23 Pa.C.S.A. § 5329(b)).

Paternal Grandparents stress that none of the offenses considered by the court are enumerated offenses under Section 5329(a). Paternal Grandparents submit the court improperly allowed testimony (over their objections) concerning Paternal Grandmother's and W.B.'s respective criminal histories, absent any prior convictions under Section 5329(a). Paternal Grandparents acknowledge that the court stated in its supplemental opinion that if it erred in admitting such testimony, the error was harmless. Paternal Grandparents suggest the court's improper admission of prior

offenses played a part in the court's determination as to the high level of conflict between the parties, where the record shows Mother used Paternal Grandmother's and W.B.'s respective criminal histories to bolster Mother's position that the court should deny Paternal Grandparents any custodial time with Children. Paternal Grandparents conclude the court's evidentiary ruling was erroneous. We agree.

Generally, our standard of review concerning evidentiary rulings is as follows:

> The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law A trial court has wide discretion in ruling on the relevancy of evidence and its ruling will not be reversed absent an abuse of discretion.

**B.K. v. J.K.**, 823 A.2d 987, 991-92 (Pa.Super. 2003) (internal citations omitted).

Section 5329 of the Act provides, in pertinent part:

**§ 5329. Consideration of criminal conviction**

**(a) Offenses.—**Where a party seeks any form of custody, the court shall consider whether that party or member of that party's household has been convicted of or has pleaded guilty or no contest to any of the offenses in this section or an offense in another jurisdiction substantially equivalent to any of the offenses in this section. The court shall consider such conduct and determine that the party does not pose a threat of harm to the child before making any order of custody to that parent when considering the following offenses:

18 Pa.C.S. Ch. 25 (relating to criminal homicide).

18 Pa.C.S. § 2702 (relating to aggravated assault).

18 Pa.C.S. § 2706 (relating to terroristic threats).

18 Pa.C.S. § 2709.1 (relating to stalking).

18 Pa.C.S. § 2901 (relating to kidnapping).

18 Pa.C.S. § 2902 (relating to unlawful restraint).

18 Pa.C.S. § 2903 (relating to false imprisonment).

18 Pa.C.S. § 2910 (relating to luring a child into a motor vehicle or structure).

18 Pa.C.S. § 3121 (relating to rape).

18 Pa.C.S. § 3122.1 (relating to statutory sexual assault).

18 Pa.C.S. § 3123 (relating to involuntary deviate sexual intercourse).

18 Pa.C.S. § 3124.1 (relating to sexual assault).

18 Pa.C.S. § 3125 (relating to aggravated indecent assault).

18 Pa.C.S. § 3126 (relating to indecent assault).

18 Pa.C.S. § 3127 (relating to indecent exposure).

18 Pa.C.S. § 3129 (relating to sexual intercourse with animal).

18 Pa.C.S. § 3130 (relating to conduct relating to sex offenders).

18 Pa.C.S. § 3301 (relating to arson and related offenses).

18 Pa.C.S. § 4302 (relating to incest).

18 Pa.C.S. § 4303 (relating to concealing death of child).

18 Pa.C.S. § 4304 (relating to endangering welfare of children).

18 Pa.C.S. § 4305 (relating to dealing in infant children).

18 Pa.C.S. § 5902(b) (relating to prostitution and related offenses).

18 Pa.C.S. § 5903(c) or (d) (relating to obscene and other sexual materials and performances).

18 Pa.C.S. § 6301 (relating to corruption of minors).

18 Pa.C.S. § 6312 (relating to sexual abuse of children).

18 Pa.C.S. § 6318 (relating to unlawful contact with minor).

18 Pa.C.S. § 6320 (relating to sexual exploitation of children).

Section 6114 (relating to contempt for violation of order or agreement).

The former 75 Pa.C.S. § 3731 (relating to driving under influence of alcohol or controlled substance).

75 Pa.C.S. Ch. 38 (relating to driving after imbibing alcohol or utilizing drugs).

Section 13(a)(1) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, to the extent that it prohibits the manufacture, sale or delivery, holding, offering for sale or possession of any controlled substance or other drug or device.

**(b) Parent convicted of murder.**—No court shall award custody, partial custody or supervised physical custody to a parent who has been convicted of murder under 18 Pa.C.S. § 2502(a) (relating to murder) of the other parent of the child who is the subject of the order unless the child is of suitable age and consents to the order.

**(c) Initial evaluation.**—At the initial in-person contact with the court, the judge, conference officer or other appointed individual shall perform an initial evaluation to determine whether the party or household member who committed an offense under subsection (a) poses a threat to the child and whether counseling is necessary. The initial evaluation shall not be conducted by a mental health professional. After the initial evaluation, the court may order further evaluation or counseling by a mental health professional if the court determines it is necessary.

\* \* \*

23 Pa.C.S.A. § 5329(a)-(c) (internal footnote omitted). Section 5330 of the

Act states:

**§ 5330. Consideration of criminal charge**

**(a) Expedited hearing.**—A party who has obtained information under 42 Pa.C.S. § 1904 (relating to availability of criminal charge information in child custody proceedings) or otherwise about a charge filed against the other party for an offense listed under section 5329(a) (relating to consideration of criminal conviction) may move for a temporary custody order or modification of an existing custody order. The court shall hold the hearing under this subsection in an expeditious manner.

**(b) Risk of harm.**—In evaluating any request under subsection(a), the court shall consider whether the party who is or has been charged with an offense set forth in section 5329(a) poses a risk of physical, emotional or psychological harm to the child.

**(c) No prejudice.**—Failure to either apply for information under 42 Pa.C.S. § 1904 or act under this section shall not prejudice any party in a custody proceeding.

23 Pa.C.S.A. § 5330. "The plain language of the statute reveals the obvious

intent of the Legislature to ensure that custody is not being provided to a

[party] whose past criminal behavior presents a present threat of harm to the child." ***Ramer v. Ramer***, 914 A.2d 894, 900-01 (Pa.Super. 2006).[42]

Instantly, during Paternal Grandmother's cross-examination, Mother's counsel sought to elicit testimony from Paternal Grandmother concerning a bad check charge in 2012 and a theft of services charge in 2009. Counsel for Paternal Grandparents objected. (***See*** N.T., 2/10/14, at 69-70; R.R. at 38a.) Mother's counsel responded: "[W]e are looking at what is in the best interest of the children. And [Paternal Grandmother] is up here basically indicating that she is a wonderful grandparent and we're just showing her history." (***Id.*** at 70; R.R. at 38a.) Mother's counsel further stated that the testimony was relevant under Section 5328(a)(16) (any other relevant factor). (***Id.***) The court overruled Paternal Grandparents' objection on this basis. (***Id.***) During W.B.'s cross-examination, Mother's counsel sought to elicit testimony from W.B. concerning a harassment charge in 2010. (***Id.*** at 129; R.R. at 68a.) Counsel for Paternal Grandparents objected, specifically stating that harassment is not an enumerated offense under Section 5329,

---

[42] This Court decided ***Ramer*** in the context of 23 Pa.C.S.A. § 5303(b) (repealed by 2010, Nov. 23, P.L. 1106, No. 112, § 1, effective January 24, 2011; re-codified at 23 Pa.C.S.A. § 5323, 5328-5330). Section 5303(b) provided similar language to the current Section 5329(a), stating: "If a parent has been convicted of or has pleaded guilty or no contest to an offense as set forth below, the court shall consider such criminal conduct and determine that the parent does not pose a threat of harm to the child before making an order of custody, partial custody or visitation to that parent[.]" 23 Pa.C.S.A. § 5303(b) (repealed). That statute listed only fourteen relevant convictions. ***See id.***

and is therefore irrelevant to the custody proceeding. (*Id.*) Mother's counsel responded: "It is absolutely relevant. We're talking about the best interest of these children. These children will be in the home where this gentleman lives. Absolutely." (*Id.*) Mother's counsel conceded Mother was not seeking an evaluation under Section 5329, but "[w]e're just talking about his character. It is about what is in the best interest of the children and the people around the children, Your Honor." (*Id.* at 130; R.R. at 68a.) The court overruled Paternal Grandparents' objection.

During Mr. Lagan's direct-examination, Mother's counsel sought to elicit testimony concerning Mr. Lagan's background investigations on Paternal Grandparents and W.B. (*Id.* at 230; R.R. at 118a.) Counsel for Paternal Grandparents again objected, explaining that Sections 5329 and 5330 specifically enumerate and discuss criminal convictions which are relevant in a custody proceeding; counsel also stated any criminal convictions pertaining to Paternal Grandparents or W.B., which are not enumerated under the statute, are irrelevant. (*Id.*) Mother's counsel responded as follows: "This matter is what is in the best interest of the children which includes what each party has in their background, what they do every day, what type of person they are, and whether or not they should be around children. It is absolutely relevant." (*Id.*) The court then had the following exchange with Mother's counsel:

- 68 -

[THE COURT]: But isn't it limited by the legislature moving into this area by defining certain specific offenses?

[MOTHER'S COUNSEL]: Your Honor, I believe the 5329 section as well as 5330 is to determine who should have an evaluation to see if they are at risk of harm to the children to be able to have any custody at all. We're certainly not representing that [Mr. Lagan's] going to give us information to say that [Paternal Grandmother] has any 5329 offenses.

She has other offenses. We're not saying that she should have—well, she should have no contact at all just based on these offenses.

We're not asking that she receive an evaluation. We're just simply speaking to the type of person who [is] around the children.

[THE COURT]: Are you saying this to me, for example, if a criminal background check reveals a person who has retail thefts, bad checks, forgeries, that somehow may impact on their character?

[MOTHER'S COUNSEL]: Essentially, Your Honor, yes. However, not to prove they will…commit those offenses again but whether or not they should be around children.

[THE COURT]: The children.

[MOTHER'S COUNSEL]: Correct.

[THE COURT]: I'll allow it. Objection is overruled.

(*Id.* at 231-233; R.R. at 119a-120a.) Subsequently, Mr. Lagan testified that he discovered Paternal Grandmother pled guilty to theft of services in October 2009, a traffic violation in 2012, and speeding in 2013. Mr. Lagan said Paternal Grandmother had another conviction for bad checks in 2012

with a disposition of guilty.[43]  Mr. Lagan also found that W.B. pled guilty to trespass by motor vehicle in 2008, and harassment in 2010.  (*Id.* at 233-35; R.R. at 120a-121a.)  Mr. Lagan provided little to no detail concerning the factual bases for any of these offenses.  Mr. Lagan also did not indicate the grading of any of the offenses.[44]  (*Id.*)

Section 5329 makes clear the type of criminal convictions the legislature deemed relevant for purposes of making an award of custody, by specifically enumerating only those crimes which evidence a threat of harm to the child.  *See* 23 Pa.C.S.A. § 5329(a); *Ramer, supra*.  The parties agree that none of Paternal Grandmother's or W.B.'s prior criminal convictions or motor vehicle offenses are listed in Section 5329(a).  The record is unclear whether any of the offenses at issue were graded higher than summary offenses.  In an effort to circumvent Section 5329, Mother's counsel attempted to obtain admission of the criminal offenses as relevant generally to Section 5328(a)(16), which permits the court to consider "any other relevant factor," and the over-arching "best interests" analysis.  We cannot agree that the court's admission of evidence concerning Paternal Grandmother's and W.B.'s criminal histories was proper under

---

[43] Mr. Lagan also indicated Paternal Grandmother was charged with operating a vehicle without required financial responsibility in 2012, but that charge was dismissed.

[44] The investigatory report(s) on which Mr. Lagan relied at trial are not included in the certified record.

subsection(a)(16), where the Act expressly delineates those criminal convictions which are relevant to a custody determination, and the offenses at issue are not among those listed.[45] **See** 23 Pa.C.S.A. § 5329(a). **See also** Pa.R.E. 401 (explaining evidence is relevant if it has any tendency to make fact more or less probable than it would be without evidence; and fact is of consequence in determining action); **Johns v. Cioci**, 865 A.2d 931 (Pa.Super. 2004) (explaining that unless it is shown that parent's conduct has had harmful effect on child, that conduct should be given little weight in custody determinations); **Vicki N. v. Josephine N.**, 649 A.2d 709 (Pa.Super. 1994) (stating party's past conduct is not relevant to custody proceeding unless it will produce ongoing negative effect on child's welfare); **Commonwealth ex rel. Gorto v. Gorto**, 444 A.2d 1299 (Pa.Super. 1982) (stating primary concern in custody matters lies not with past but with present and future; facts as of time of trial are foundation for court's determination; past conduct is not relevant unless it will produce ongoing negative effect on child's welfare).

Moreover, under the doctrine of *ejusdem generis*, the court cannot

---

[45] On appeal, Mother argues **only** that testimony concerning Paternal Grandmother's and W.B.'s respective criminal histories was relevant to determine, based on their character or reputation, whether it is in the best interest of Children for Paternal Grandmother and W.B. to be around Children. (**See** Mother's Brief at 51-54.) Mother does not argue that she offered Paternal Grandmother's or W.B.'s criminal histories for impeachment purposes.

consider other criminal offenses under the general language of Section 5328(a)(16), where the Act expressly delineates those criminal convictions which the legislature deemed relevant to a custody determination, and the offenses at issue are not among those listed. *See generally McClellan v. Health Maintenance Organization of Pennsylvania*, 546 Pa. 463, 473, 686 A.2d 801, 806 (1996) (explaining: "[u]nder our statutory construction doctrine [of] *ejusdem generis* ("of the same kind or class"), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. When the opposite sequence is found, *i.e.*, specific words follow general ones,…the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated"). Mother cites no law to the contrary.[46] Therefore, the court erred by admitting into evidence Paternal Grandmother and W.B.'s previous offenses, which fell outside of Section 5329.[47] *See B.K., supra*.

_____

[46] Instead, Mother relies on generic legal principles stating that criminal convictions are reasonably probative as to the reputation of an individual and have impact upon assessing a person's character. (*See* Mother's Brief at 51-54.)

[47] In its supplemental trial court opinion, the court indicated that to the extent the court improperly admitted the evidence at issue, the error was harmless. (*See* Supplemental Rule 1925(a) Opinion at 1-2.) In the event
*(Footnote Continued Next Page)*

Accordingly, we reverse the trial court's decision to deny Paternal Grandparents' request for partial physical custody and remand for the trial court to enter immediately as a final order, the interim custody order dated October 4, 2013 and entered October 7, 2013. Mother must fix the Skype feature on her cell phone or home computer to allow visual capabilities within thirty (30) days of this disposition. Alternatively, the parties could consider using FaceTime to communicate.

Order reversed; case remanded with instructions. Jurisdiction is relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/17/2015

---

*(Footnote Continued)* ———————————

that this matter might proceed to a new custody trial at some point in the future, the trial court's harmless error analysis would be immaterial.

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
## CIVIL ACTION – LAW

K.T. and
M.R.T.

**Plaintiffs**

v.

L.S, f/k/a
L.R.

**Defendant**

No.  2013-FC-001604-03

**Action in Custody**

APPEARANCES:     For Plaintiff:     David Schanbacher, Esquire

For Defendant:     Joseph A. Kalasnik, Esquire

This matter has been assigned to the Honorable _Thomas H. Kelley VI_

## INTERIM ORDER FOR CUSTODY, PENDING TRIAL

AND NOW, this __4th__ day of __October__ __, 2013, this Order is being entered as a result of a pre-trial conciliation conference held on September 27, 2013 before Leslie S. Arzt, Conciliator.  The matter is before the Court on paternal Grandparents' petition seeking partial physical custody.  The parties were unable to reach an agreement to resolve these issues.  Accordingly, this Order is being entered

1

on an interim basis, in the best interests of the children, and to govern the relationship of the parties pending a trial in this matter.

**MEDIATION:**

Mediation has been waived due to the distance of the parties.

**CUSTODY WORKSHOP:**

The parties are hereby directed to participate in, and successfully complete the custody workshop, consisting of the Kids First custody workshop, which is provided at Family-Child Resources. Paternal Grandparents can attend a similar workshop in Erie, PA. Informational pamphlets have been given to the parties. The parties shall contact the appropriate agency within ten (10) days of the date of this Order. The parties shall obtain certificates of successful completion of the training, and shall file their certificates of completion with the Prothonotary within sixty (60) days of the date of this Order.

**MATTERS PRELIMINARY TO TRIAL:**

The trial of this case will be scheduled formally at a pre-trial conference which will be scheduled by separate Order. Requests for a continuance of the pre-trial conference shall be in writing and addressed to the Judge conducting the pre-trial conference, not later than two (2) weeks prior to the date of the pre-trial conference.

The parties shall submit to the Court a proposed parenting plan pursuant to 23 Pa.C.S.A. §5331 not later than one (1) week prior to the time scheduled for the pre-trial conference.

The parties are directed to cooperate in obtaining psychological evaluations, home studies, and other investigations, which shall be requested **within fifteen (15)**

2

**days of the date of this Order. If such services are not requested by a party within that time period, the party is deemed to have waived the right to obtain such services.** Each party shall pay the costs of all evaluations and studies which that party requests, except that if the parties agree on a single evaluator for any purpose, the cost of that evaluator shall be divided evenly between the parties.

**23 Pa. C.S.A. §5329:**

The parties represent that none of them, nor any member of his or her household, has been convicted of an offense enumerated in 23 Pa. C.S. §5329 or an equivalent offense in another jurisdiction.

**BACKGROUND OF THE CASE:**

This matter involves the custody of:

| | | |
|---|---|---|
| K. R. | YOB: 2009 | AGE: 4 |
| K. T. | YOB: 2007 | AGE: 6 |

MOTHER'S position is: Mother avers that the paternal grandparents should have no contact with the children.

PATERNAL GRANDPARENT'S position is: Paternal Grandparents are seeking partial physical custody of the children.

A previous court order concerning the children was entered on July 12, 2010 between Mother and Father, prior to Father's death. There are no prior custody orders involving the Plaintiffs in this case.

3

**SOLE LEGAL CUSTODY:**

The Court hereby awards sole legal custody to Mother. Sole legal custody means the right of a party to exercise parental control over and make major decisions for the benefit of the children, including, but not limited to, educational, medical and religious decisions, without the necessity of obtaining the agreement of any other party.

**PHYSICAL CUSTODY:**

Primary physical custody of the children, as that term is defined in the Custody Act, shall be with Mother.

Partial physical custody is the right to take possession of the children away from the custodial party for a certain period of time. Paternal Grandparents shall have partial physical custody of the children as follows:

## SCHEDULE OF PARTIAL CUSTODY:

**PHASE-IN:**

Paternal Grandparents shall enjoy partial custody of the children as follows:

- On Friday, September 27, 2013 from 5:30 p.m. until 7:30 p.m. at Hickory Falls in Hanover. Mother shall be present for this visit.

- On September 28, 2013, from 9:30 a.m. until 12:00 noon at Wirt Park in Hanover Borough. Mother shall be present for this visit.

- During the children's Christmas break from school in December 2013, from Friday, December 27th through December 29th. Mother shall travel to Corry, PA with the children and the visits shall occur at paternal grandmother's residence. On Friday, December 27th the visit shall occur from 5:30p.m. until

4

8:30p.m. and Mother shall be present. She shall be responsible to transport the children to and from paternal grandmother's residence for said visit. On Saturday, December 28th from 9:30a.m. until 7:30 p.m. with Mother present for the first half of the visit through 2:00 p.m. On Sunday, December 29th from 9:30a.m. until 12:30 p.m. without Mother being present. Mother shall be responsible to transport the children to and from paternal grandmother's residence for said visits.

- Two (2) weekends between January 1, 2014 and June 1, 2014 so long as Paternal Grandparents travel to Hanover, PA. Said weekends shall begin on Friday evening at 5:30 p.m. and end at 12:30 p.m. on Sunday. Paternal grandparents shall provide Mother with at least thirty (30) days' notice of their requested weekends.

## REGULAR SCHEDULE OF PARTIAL PHYSICAL CUSTODY:
**Summer:**

In the Summer of 2014, and each summer thereafter, Paternal Grandparents shall enjoy a total of three (3) weeks with the children during the children's summer vacation from school. Paternal grandparents shall designate one (1) week in June, July and August to begin on a Sunday at 12:30 pm through the following Sunday at 12:30 p.m. Paternal Grandparents shall advise Mother of their intended periods of custody at least thirty (30) days prior to their intended summer vacation periods.

**Throughout the School year:**

Paternal Grandparents shall be entitled to enjoy up to four weekends per school year, by designating two (2) weekends in the fall and two (2) weekends in the spring that they may travel to Hanover, Pennsylvania to spend time with the children from Friday at 5:30 p.m. through Sunday at 12:30 p.m. Paternal Grandparents shall provide Mother with at least thirty (30) days' notice of their requested weekends.

**Christmas:**

Paternal Grandparents shall enjoy up to four overnight periods during the children's Christmas break from school, to begin no earlier than December 27th through December 31st each year.

**OTHER TIMES:**

At any other times that the parties by mutual agreement can agree.

**TRANSPORTATION:**

Except as noted herein above with regard to the phase-in period, the transportation burden shall generally be shared by the parties, with the party who is to obtain custody at the time of exchange to provide for transportation from the residence of the other party, unless otherwise specified. At all times, the children shall be secured in appropriate passenger restraints. No person transporting the children shall consume alcoholic beverages prior to transporting the children. No person transporting the children shall be under the influence of any alcoholic beverages while transporting the children.

6

**LATE FOR EXCHANGE:**

In the event any party is more than 20 minutes late for a scheduled custody exchange, in the absence of a telephone call or other communication from the party, the other party may assume that the party who is late has chosen not to exercise that period of custody, the period will be forfeited, and the other party will be free to make other plans with the children.

**TELEPHONE CALLS/SKYPE:**

The parties are urged to use common sense in scheduling telephone calls to talk to the children. The parties are hereby directed to refrain from preventing the party who may be calling from talking to the children, or preventing the children from calling the other parties, provided that the phone calls are not excessively frequent or too long in duration that they disrupt the children's schedule.

Beginning on Sunday, October 6, 2013 at 7:00 p.m., and every Sunday thereafter, the children shall be available to communicate with Paternal Grandparents through Skype. The parties shall exchange their respective emails to set up the Skype communication within seven (7) days, or no later than Friday, October 4, 2013.

**DISPARAGING REMARKS:**

Each of the parties and any third party in the presence of the children shall take all measures deemed advisable to foster a feeling of affection between the children and the other parties. Neither party shall do nor shall either party permit any third person to do or say anything which may estrange a child from the other parties, their spouse or

7

relatives, or injure a child's opinion of the other party or which may hamper the free and natural development of a child's love and respect for the other parties.

The parties shall not use a child to convey verbal messages to the other party about the custody situation or changes in the custody schedule.

**FINANCIAL CARE OF CHILD:**

In the event that a significant matter arises with respect to the medical care, education, or financial care of the children, such as a change in occupation, health insurance, educational expenses, or residence of a party, those matters shall be discussed with the other party before any change is made by either party.

**MUTUAL CONSULTATION:**

Each party shall keep the other informed of his or her residence and telephone number to facilitate communication concerning the welfare of the children and visitation.

**WELFARE OF CHILDREN TO BE CONSIDERED:**

The welfare and convenience of the children shall be the prime consideration of the parties in any application of the provisions of this order. Both parties are directed to listen carefully and consider the wishes of the children in addressing the custodial schedule, any changes to the schedule, and any other parenting issues.

**SMOKE / DRINK / ILLEGAL SUBSTANCES:**

No party shall smoke in a confined area, consume alcohol beverages to excess or use illicit drugs while exercising physical custody of the children. Nor shall either party permit another person to smoke in a confined area, consume alcohol beverages to excess or use illicit drugs when the children are present. No party shall be under the

8

influence of alcoholic beverages or illegal substances when in the presence of the children.

## RELOCATION OF A PARTY:

A relocation is defined as a change in a residence of the children which significantly impairs the ability of a non-relocating party to exercise custodial rights. 23 Pa.C.S. §5322. No relocation shall occur unless every individual who has custody rights to the children consents to the proposed relocation or the court approves the proposed relocation. If a party seeks to relocate, that party shall notify every other individual who has custody rights to the children. Both parties must follow the statutory requirements contained in 23 Pa.C.S. §5337. Specifically, the relocating party must notify every other individual who has custody rights to the children by certified mail, return receipt requested. The notice must then comply with the following requirements:

Notice must be sent no later than:

(1)   the 60th day before the date of the proposed relocation; or

(2)   the 10th day after the date that the individual knows of the relocation if the individual did not know and could not reasonably know of the relocation in sufficient time to comply with the 60 day notice requirement and it is not reasonably possible to delay the date of relocation so as to comply with the 60 day notice requirement.

Unless otherwise excused by law, the following information must be included in the notice:

(1)   The address of the intended new residence.

9

(2) The mailing address, if not the same as the address of the intended new residence.

(3) Names and ages of the individuals in the new residence, including individuals who intend to live in the new residence.

(4) The home telephone number of the intended new residence, if applicable.

(5) The name of the new school district and school.

(6) The date of the proposed relocation.

(7) The reasons for the proposed relocation.

(8) A proposal for a revised custody schedule.

(9) Any other information which the party proposing the relocation deems appropriate.

(10) A counter-affidavit as provided under subsection (d)(1) which can be used to object to the proposed relocation and modification of a custody order.

(11) A warning to the non-relocating party that if the non-relocating party does not file with the court an objection to the proposed relocation within 30 days after receipt of notice, that party shall be foreclosed from objecting to the relocation.

If any of the aforementioned information is not known when the notice is sent but is later made known to the party seeking the relocation, then that party shall promptly inform every individual who received notice.

If the non-relocating party objects to the proposed move he/she must do so by filing the counter-affidavit with the court and the other party within 30 days. The notice of objection to the opposing party must be sent by certified mail, return receipt requested. If no objection is made in the manner set forth above then it shall be presumed that the non-relocating party has consented to the proposed relocation and

10

the court will not accept testimony challenging the relocation in any further review of the custodial arrangements.

The court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before relocation occurs. The Court may permit relocation before a full hearing if the court finds that exigent circumstances exist.

**MODIFICATION OF ORDER:**

The parties are free to modify the terms of this order but in order to do so the Court makes it clear that both parties must be in complete agreement to any new terms. That means both parties must consent on what the new terms of the custody arrangement or visitation schedule shall be.

In the event that one or the other does not consent to a change, that does not mean each follows your own idea as to what you think the arrangements should be. The reason this Court Order is set out in detail is so both parties have it to refer to and to govern your relationship with the children and with each other in the event of a disagreement.

Plaintiffs / Paternal Grandparents were both born in 1967. Defendant / Mother was born in 1990.

Copies of this Order shall be sent to counsel for the parties.

BY THE COURT,

_____
JUDGE

11